This document was signed electronically on October 3, 2016, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated:  October 3, 2016



**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| COSHOCTON COUNTY MEMORIAL | ) |
| HOSPITAL ASSOCIATION, | ) Case No. 16-51552 |
| an Ohio nonprofit corporation, | ) |
| | ) Judge Koschik |
| Debtor. | ) |
| | ) |
| (Federal Tax I.D. No. 31-4387577) | ) |

**ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Upon consideration of the Motion of Debtor for an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 20) (the "Sale Motion"), filed by the above-captioned debtor and debtor in possession (the "Debtor");

And the Court having entered the Order Approving Motion of Debtor for an Order: (A)

{6187496:9}

Approving Bidding Procedures for Sale of Substantially all of the Debtor's Assets; (B) Authorizing and Scheduling An Auction; (C) Scheduling Hearing For Approval of the Sale of Assets Free and Clear of Liens and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; (D) Approving Breakup Fee and Expense Reimbursement; (E) Approving Procedures and Setting Deadlines for the Establishment of Cure Costs for Executory Contracts and Unexpired Leases, Including Cure Amounts Relating Thereto; (F) Approving Certain Deadlines and the Form, Manner and Sufficiency of Notice; and (G) Granting Other Related Relief (Docket No. 92) (the "Bidding Procedures Order"),[1] on July 22, 2016; and the Court having held a hearing (the "Sale Hearing") on September 27, 2016, to consider the Sale Motion;

And the Debtor having filed the Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned (Docket No. 123) and the Amended Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned (Docket No. 178) (collectively, the "Cure Notice");

And the Debtor having filed the First Notice to Counterparties to Executory Contracts and Unexpired Leases that Will Be Assumed and Assigned (Docket No. 190) (the "Initial Assignment Election");

And the filing of certain objections and reservations of right to certain related relief requested in the Sale Motion with respect to cure costs and the assumption and assignment of certain executory contracts and unexpired leases by: Cigna Health and Life Insurance Company (Docket Nos. 156, 195, the "Cigna Objections"); 3M Company (Docket No. 157); Infor (US), Inc. (Docket No. 163, the "Infor Objection"); Walnut Grove NH LLC (Docket No. 164); Karl

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Sale Motion, the Bidding Procedures Order, and the ASA (defined below).

{6187496:9}

2

Storz Capital (Docket No. 167); Karl Storz Endoscopy-America, Inc. (Docket No. 168); Genesis HealthCare System (Docket No. 169, the "Genesis Cure Objection"); United States of America, Secretary of Health and Human Services/Centers for Medicare & Medicaid (Docket No. 170); Champion Energy Services and Champion Energy, LLC (Docket No. 171); AmerisourceBergen Drug Corporation (Docket No. 174, the "ABDC Cure Objection"); and Aetna Inc. (Docket No. 182) (collectively, the "Cure Objections");

And the filing of certain objections to the relief requested in the Sale Motion by: United States of America, Secretary of Health and Human Services/Centers for Medicare & Medicaid (Docket No. 180); AmerisourceBergen Drug Corporation (Docket No. 181, the "ABDC Sale Objection"); and Genesis HealthCare System (Docket No. 185, the "Genesis Sale Objection");

And the Official Committee of Unsecured Creditors (the "Committee") having filed the Response of Official Committee of Unsecured Creditors to Limited Objection of AmerisourceBergen Drug Corporation to Motion of Debtor for an Order: (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 199);

And the Court having reviewed the Amended Stipulation Resolving Limited Objections of United States of America to Motion of Debtor for an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 206) (the "Amended CMS Stipulation"), agreed to by the Debtor and United States of America, Secretary of Health and Human Services/Centers for Medicare & Medicaid ("CMS"), and acknowledged by the Successful

Bidder;

And the Debtor having filed the Notice of Adjournment of September 27, 2016, Hearing Solely with Respect to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Docket No. 197) (the "Supplemental Assignment Notice"), which adjourned substantially all of the Cure Objections except for the objections filed by CMS, Walnut Grove NH LLC ("Walnut Grove") and AmerisourceBergen Drug Corporation ("ABDC");

And the Court having reviewed the Declaration of Lorri Wildi in Support of Motion of Debtor for an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 201);

And the Court having reviewed the Declaration of Matthew Caine Support of Motion of Debtor for an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 202);

And the Court having reviewed the Declaration of Troy Schell in Support of Motion of Debtor for an Order (A) Authorizing Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (Docket No. 200);

And the Court having found that (i) the Court has jurisdiction to consider the Sale Motion in accordance with 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this District pursuant to 28

U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b);

And the Court having considered the Sale Motion, its supporting materials, and all responses thereto; and after due deliberation thereon; and the appearance of all interested parties, and all responses and objections to the Sale Motion have been noted on the record at the Sale Hearing; and it appearing that the entry of this Order and granting the relief set forth herein are in the best interests of the Debtor and its bankruptcy estate; and good and sufficient cause having been shown;

**IT IS FURTHER FOUND AND DETERMINED THAT:**

A.      As evidenced by certificates filed with the Court, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the entry of the Bidding Procedures Order and the dates and deadlines set forth therein, including the procedures required for the submission of Qualified Bids for the Assets and for participation by interested bidders at the Auction; (ii) the Sale Motion; (iii) the Sale Hearing; (iv) the transactions contemplated under the Asset Sale Agreement and Amendment No. 1 to Asset Sale Agreement (as filed at Docket No. 196) (collectively, the "ASA") of Prime Healthcare Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under § 501(c)(3) of the Code, and Prime Healthcare Foundation-Coshocton, LLC a Delaware limited liability company (collectively the "Successful Bidder"), including the sale of the Assets (the "Sale"); and (v) the Notice of No Competing Bids and Cancellation of the Auction (Docket No. 187), has been provided as required by the Bidding Procedures Order, and the same constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding the Sale Motion, the Auction, the Sale Hearing, and the entry of this Order, under sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6006 and 9014, and the Bidding Procedures Order. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding, the Sale Motion, the Sale Hearing, or the entry of

this Order need be given to any entity.

B.    As demonstrated by the representations of counsel made on the record at the Sale Hearing, the Debtor and its professionals and other representatives have complied in all respects and in good faith with the Bidding Procedures Order, including by affording entities that expressed an interest in submitting a Qualified Bid a full, fair, and reasonable opportunity to obtain necessary due diligence information and to submit the materials required under the Bidding Procedures Order by the Bid Deadline.

C.    The Debtor is the sole and lawful owner of, and has clear and marketable title to, the Assets to be sold, including all items of personal property owned by the Debtor as identified in the ASA.

D.    The Successful Bidder has offered to purchase the Assets free and clear of all Liens (defined below), excluding any Assumed Liabilities and Permitted Exceptions as provided in the ASA, to the full extent authorized under section 363(f) of the Bankruptcy Code, with the same to attach to the proceeds of the Sale, if any, with the same validity and priority and to the same extent as existed before the Sale. The Successful Bidder would not enter into the ASA to purchase the Assets other than though a sale of such Assets free and clear of all Liens.

E.    The offer to purchase the Assets made by the Successful Bidder, under the terms and conditions set forth in the ASA: (i) represents the highest or otherwise best offer obtained for the Assets; (ii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Assets being conveyed to the Successful Bidder; and (iii) would not have been made by the Successful Bidder absent the protections afforded to the Successful Bidder by the Bidding Procedures Order, the ASA, the Bankruptcy Code and this Order.

F.    The Debtor's determination is that the Sale to the Successful Bidder, pursuant to the ASA, provides the highest or otherwise best offer for the Assets, and its related decision to sell the Assets to the Successful Bidder, each constitutes a reasonable exercise of the Debtor's

{6187496:9}

6

business judgment and each is in the best interests of the Debtor, its bankruptcy estate, and its creditors. The Debtor has articulated sound business reasons for consummating the ASA and for selling the Assets outside of a plan of reorganization or liquidation. It is a reasonable exercise of the Debtor's business judgment to execute, deliver, and consummate the ASA and consummate the transactions contemplated by the ASA, subject to this Order. The facts and circumstances stated herein demonstrate the exigent nature of the Debtor's business situation, to support the sale of the Assets at this stage of the Debtor's chapter 11 case, and outside a plan of reorganization and/or liquidation.

G. Each entity with a Lien in any of the Assets to be transferred on the Closing Date has (i) consented to, or is deemed to have consented to, the Sale free and clear of such Lien, (ii) could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Lien, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code and has been satisfied as to all such Liens. Those holders of Liens who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to entry of this Order pursuant to section 363(f)(2) of the Bankruptcy Code. Each holder of a Lien that did not so object is adequately protected by having its Lien, if any, attach to the net cash proceeds of the Sale ultimately attributable to the property against or in which it asserts a Lien, with same validity and priority, and to the same extent, as existed before the Sale, and subject to the terms of the instruments that created such Lien and to any claims and defenses the Debtor and its bankruptcy estate may possess with respect thereto. Therefore, approval of the ASA and consummation of the Sale free and clear of Liens is appropriate pursuant to section 363(f) of the Bankruptcy Code.

H. The Successful Bidder is not holding itself out to the public as a continuation of the Debtor and no common identity of directors, stockholders, members, or other equity holders exists between the Successful Bidder and the Debtor. To the fullest extent permitted by

applicable law, the transactions contemplated by the ASA do not amount to a consolidation, merger, or *de facto* merger of the Successful Bidder and the Debtor and/or the Debtor's bankruptcy estate; there is neither substantial continuity of enterprise between the Debtor and the Successful Bidder, nor is the Successful Bidder a mere continuation of the Debtor or its bankruptcy estate, and the Successful Bidder does not constitute a successor to the Debtor or its bankruptcy estate.

I.      To the fullest extent authorized by section 363(f) of the Bankruptcy Code and to the fullest extent permitted by applicable law, the Successful Bidder's acquisition of the Assets shall be free and clear of any successor liability claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.

J.      To the fullest extent permitted by applicable law, the transfer of the Assets to the Successful Bidder is or will be a legal, valid, and effective transfer of the Assets, and will vest the Successful Bidder on the Closing Date (as defined in the ASA) with all right, title, and interest in and to the Assets, free and clear of the Liens, except those explicitly and expressly excluded by the Successful Bidder in the ASA or this Order.

K.      The ASA and the transactions contemplated thereunder were negotiated at arm's length, without collusion, and in good faith within the meaning of section 363(m) of the Bankruptcy Code.

L.      The Debtor and the Successful Bidder did not engage in any conduct that would allow the ASA to be set aside pursuant to section 363(n) of the Bankruptcy Code.

M.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

N.      To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of

fact, they are adopted as such.

**IT IS HEREBY ORDERED THAT:**

1. The Sale Motion is GRANTED as set forth herein.

2. All objections – including the ABDC Sale Objection – and responses to the Sale Motion that have not been overruled, withdrawn, waived, adjourned, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied. Notwithstanding anything to the contrary herein, the Infor Objection is adjourned until the Assignment Hearing (defined below) and all of the rights and arguments of Infor (US), Inc. ("Infor") in connection therewith are fully reserved. The Cigna Objections are overruled as to the "Disposition of the Provider Agreements" sections listed in the Cigna Objections, but all other parts of the Cigna Objections are adjourned until the Assignment Hearing (defined below). The Genesis Sale Objection and the Genesis Cure Objection are each deemed adjourned pursuant to that *Agreed Order Continuing Hearing on Motion of Creditor Genesis HealthCare System for 2004 Examination of Prime Healthcare Foundation, Inc., and Prime Healthcare Foundation-Coshocton, LLC and Production of Documents* (Docket No. 194) (the "Genesis Agreed Order"). Except with respect to the objections of CMS, Walnut Grove, and ABDC, as detailed below, all of the other Cure Objections – including the Cigna Objections, the Infor Objection and the ABDC Cure Objection – are hereby adjourned until the Assignment Hearing (defined below).

3. The Debtor, the Committee and ABDC shall work in good faith to exchange factual information on or before November 1, 2016, relating to the alleged secured claim and 503(b)(9) claim asserted by ABDC. The Debtor, the Committee and ABDC shall report to the Court on the status of this information exchange at a hearing on November 1, 2016 at 2:00 p.m. (prevailing Eastern Time). The hearing on the Application for Administrative Expenses Filed by Creditor AmerisourceBergen Drug Corporation (Docket No. 105) is also adjourned until November 1, 2016 at 2:00 p.m. (prevailing Eastern Time).

4.    The Debtor, in transferring the Assets pursuant to this Order and section 363 of the Bankruptcy Code, is deemed, under section 1107(a) of the Bankruptcy Code, to have all rights and powers to perform all the functions and duties of a trustee serving in a case under chapter 11, and will transfer the property pursuant to this Order.

5.    The Sale of the Assets to the Successful Bidder under the ASA constitutes a transfer for reasonably equivalent value and fair consideration. The Sale of the Assets to the Successful Bidder is a legal, valid, and effective transfer of the Assets notwithstanding any requirement for approval or consent of any entity.

6.    To the fullest extent permitted by applicable law, neither the Successful Bidder nor its affiliates, successors or assigns shall, as a result of the consummation of the transactions set forth in the ASA: (i) be a successor to the Debtor or the Debtor's bankruptcy estate; (ii) have, *de facto* or otherwise, merged consolidated with or into the Debtor or the Debtor's bankruptcy estate; (iii) be a continuation or substantial continuation of the Debtor or any enterprise of the Debtor; or (iv) be a joint employer or co-employer with, or successor employer of the Debtor. The Successful Bidder shall not assume, nor be deemed to assume or in any way be responsible for any liability or obligation of the Debtor and/or its bankruptcy estate, except as otherwise set forth herein or in the ASA.

7.    Pursuant to sections 105 and 363(b) and (f) of the Bankruptcy Code and to the fullest extent permitted by applicable law, title to the Assets shall pass to the Successful Bidder on the Closing Date, free and clear of any and all liens (including mechanics', materialmens', and other consensual and nonconsensual liens and statutory liens), security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages, deeds of trust, pledges, any liabilities or obligations under any State or Federal WARN Act or similar law, any liabilities or obligations under COBRA, covenants, restrictions, hypothecations, charges, indentures, loan agreements,

instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, recoupment, rights of recovery, judgments, orders and decrees of any court of foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, tax and other liabilities, causes of action and claims, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or know or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Liens"), with all such Liens upon the Assets to be unconditionally released, discharged, and terminated as against either the Assets or the Successful Bidder; provided, however that any Assumed Obligations or Permitted Exceptions as set forth in the ASA shall be excluded from the aforementioned definition of Liens. Any such Liens, including, but not limited to, any Liens held by ABDC, shall attach to the proceeds of the sale of the Assets with the same priority, validity, force, and effect (if any) as existed with respect to the Assets as of the Petition Date. If there are any Excluded Assets and/or proceeds thereof that come into the possession of the Successful Bidder, the Successful Bidder shall (a) hold such Excluded Asset and/or the proceeds thereof in trust for the benefit of the Debtor, its estate and/or any liquidating trust or similar structure that may be established pursuant to a plan of liquidation confirmed herein and (b) promptly deliver such Excluded Asset and/or the proceeds thereof to the Debtor, its estate and/or any liquidating trust or similar structure that may be established pursuant to a plan of liquidation confirmed herein.

8.    The provisions of this Order authorizing the Sale of the Assets free and clear of Liens shall be self-executing, and neither the Debtor nor the Successful Bidder shall be required

to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the foregoing provisions of this Order; provided, however, that this paragraph shall not excuse such parties from performing any and all of their respective obligations under this Order or the ASA. All persons and entities (a) holding Liens on the Assets, (b) that have filed financing statements, mortgages, or other documents or instruments evidencing claims against the Assets, or (c) otherwise asserting claims against the Assets shall, and hereby are directed to, execute and deliver to the Successful Bidder such releases or termination statements to effectuate the Sale of the Assets to the Successful Bidder free and clear of any and all Liens. In the event a Financing Statement is not promptly terminated by the creditor as herein provided, he Debtor is hereby authorized to file a UCC-3 termination statement.

9.      Nothing in this Order shall be deemed an admission, acknowledgment, or allowance of the validity, extent, or priority of any Liens that may attach to the proceeds of the sale of Assets, and any and all rights, claims, defenses, and other challenges of the Debtor, the Committee, or any other parties-in-interest with respect to the validity, extent, priority, or avoidability of such Liens are hereby expressly preserved. All such rights, claims and defenses are hereby preserved for the benefit of the estate.

10.     The Successful Bidder's offer for the Assets, as embodied in the ASA, is the highest and best offer for the Assets and is hereby approved.

11.     The ASA, substantially in the form attached hereto as <u>Exhibit 1</u>, is hereby approved pursuant to section 363(b) of the Bankruptcy Code and the Debtor is authorized and directed to consummate and perform all of its obligations under the ASA and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the ASA. For the avoidance of doubt, the Debtor and the Successful Bidder (upon consultation with the Committee) may make non-material changes to the ASA up to the closing of the Sale,

provided that the Debtor files a copy of the final executed version of the ASA in the chapter 11 case if the ASA is modified following entry of this Order.

12. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtor to the Successful Bidder for the Assets and transactions related thereto, upon the closing under the ASA, are authorized and approved in all respects. Nothing contained in any chapter 11 plan confirmed in the Debtor's chapter 11 case or the order confirming any chapter 11 plan, nor any order dismissing or converting the chapter 11 case shall conflict with or derogate from the provisions of the ASA, any documents or instrument executed in connection therewith, or the terms of this Order.

13. The terms of this Order shall be binding on the Successful Bidder and its successors and assigns, the Debtor, creditors of the Debtor and on all other parties in interest in the Debtor's chapter 11 case, and any successors of the Debtor, including any trustee or examiner appointed in the chapter 11 case or upon a conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code.

14. The Successful Bidder is a good faith purchaser entitled to the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

15. With respect to the transactions consummated pursuant to this Order, this Order shall be the sole and sufficient evidence of the transfer of title to the Successful Bidder, and the sale transaction consummated pursuant to this Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials,

and each of such persons and entities is hereby directed to accept this Order as sole and sufficient evidence of such transfer of title and shall rely upon this Order in consummating the transactions contemplated hereby.

16.    Pursuant to section 105 of the Bankruptcy Code, creditors of the Debtor are prohibited from taking any actions against the Successful Bidder or the Assets; provided, however, that nothing in this paragraph shall prevent any party from seeking to enforce against the Successful Bidder any applicable rights or obligations under the ASA or this Order.

17.    The Sale contemplates the sale of substantially all of the Debtor's Assets, including "personally identifiable information" contained in the Hospital's files. A condition of the Sale is that the Successful Bidder will become the Debtor's successor-in-interest as to the "personally identifiable information" and to use the information only in accordance with the privacy policy of the Debtor or a similarly stringent policy that complies with the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

18.    To the fullest extent permitted by applicable law and except as otherwise provided for herein and in the ASA, the transfer of the Assets and the assumption of the Assumed Contracts and Assumed Leases does not and will not subject the Successful Bidder and/or its affiliates, designees, assignees, successors, or any of their properties, assets, officers, directors, members, employees, or equity holders (together with Successful Bidder, the "Prime Entities") to any liability of the Debtor other than Assumed Liabilities under the ASA by reason of such transfers and assignments under the laws of the United States, any state, territory, or possession thereof, or the state of Ohio based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of successor or transferee liability, persons

and entities' hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' Liens against the Prime Entities

19.     Effective on the Closing Date, to the fullest extent permitted by applicable law, all parties and/or entities asserting Liens and contract rights against the Debtor and/or any of the Assets are hereby permanently enjoined and precluded from, with respect to such Liens: (i) asserting, commencing, or continuing in any manner any action against the Prime Entities (each a "Protected Party," and all such entities collectively, the "Protected Parties"), or against any Protected Party's assets or properties, including without limitation against the Assets; (ii) the enforcement, attachment, collection, or recovery, by any manner or means, of any judgment, award, decree, or order against the Protected Parties or any properties or Assets of the Protected Parties; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Protected Parties or any properties or Assets of the Protected Parties, including without limitation the Assets; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any place whatsoever, against the Protected Parties on account of any liabilities of the Debtor (other than Assumed Liabilities pursuant to the ASA) that does not conform to or comply with the provisions of this Order or the ASA. Neither the Successful Bidder nor the Debtor is required to comply with any "bulk sale" or similar laws relating to the transfer of the Assets.

20.     The Debtor and its estate, on the one hand, and the Prime Entities, on the other hand, hereby release each other from any and all claims except for such claims that arise from the ASA and this Order.

21.     The Court retains jurisdiction to interpret, implement, and enforce the provisions of, and resolve any disputes arising under or related to, this Order and the ASA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith.

{6187496:9}

22.     The failure specifically to include any particular provisions of the ASA or any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the force of such provision, document, agreement, or instrument, it being the intent of the Court that the ASA and each document, agreement, or instrument be authorized and approved in its entirety.

23.     Subject to the terms of the ASA, the ASA and any related agreements may be modified, amended, or supplemented (or the terms thereof waived) by agreement of the Debtor and Successful Bidder, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the ASA and any related agreements and is consistent with this Order; provided further that the Debtor and Successful Bidder shall consult with the Committee with respect to any proposed waiver, modification, amended or supplement relating to the ASA. The Debtor and Successful Bidder shall have the right, subject to the right of review and objection by the Committee, to enter into a management agreement or transition services agreement in order to further effectuate the terms of the ASA.

24.     Pursuant to sections 365(a), (b), (c), and (f) of the Bankruptcy Code, the Debtor is authorized to assume the Assumed Contracts and Assumed Leases identified in the Initial Assignment Election upon the terms and conditions set forth in the ASA and pursuant to the terms of this Order; provided, however, that there shall be no assumption of any such Assumed Contract absent simultaneous assignment thereof to the Successful Bidder and payment of the applicable Cure Cost by the Successful Bidder; and provided further that the Timeshare Lease dated February 11, 2015 between Coshocton County Memorial Hospital Association and Genesis Medical Group LLC shall not be deemed as an Assumed Contract or Assumed Lease for any purposes of this Order and shall not be deemed to be assumed and assigned as a result of being listed on the Initial Assignment Election or otherwise pursuant to the terms of this Order.

25.     Pursuant to the Supplemental Assignment Notice and Section 1.11(a) of the ASA, the Successful Bidder shall provide written notice by October 7, 2016, to the Debtor of Successful Bidder's desire to add any additional executory contract or unexpired lease that will become an Assumed Contract or Assumed Lease under the ASA (the "Supplemental Assignment List"). The Debtor shall file and serve the Supplemental Assignment List by October 10, 2016. The Court will hold a hearing on the assumption and assignment of the contracts and leases set forth in the Supplemental Assignment List on October 21, 2016 at 10:00 a.m. (prevailing Eastern Time) (the "Assignment Hearing"). All rights of any parties that may be placed on the Supplemental Assignment List are hereby reserved.

26.     As part of its consideration for the Assets and except as provided in and limited by the ASA with respect to Cure Costs (as defined therein), the Successful Bidder shall cure any and all defaults with respect to the Assumed Contracts and Assumed Leases and compensate all counterparties for any actual pecuniary loss resulting from such defaults or as otherwise agreed by and between Successful Bidder and its respective counterparty.

27.     On the Closing Date, the cure amounts relating to Assumed Contracts and Assumed Leases to which Successful Bidder and the applicable contracting counterparty have agreed or that have been fixed by operation of the Cure Notice and the Initial Assignment Election as to the allowed Cure Costs shall be paid by Successful Bidder. Any disputed cure amounts for Assumed Contracts and Assumed Leases that become part of the Supplement Assignment List shall be shall be addressed at the Assignment Hearing. Payment of the Cure Costs by the Successful Bidder shall discharge and release all of the Debtor's obligations to: (i) cure, or provide adequate assurance that the Debtor will promptly cure, any defaults under the Assumed Contracts and Assumed Leases; and (ii) compensate, or provide adequate assurance that the Debtor will promptly compensate, any counterparty to the Assumed Contracts and

Assumed Leases for any actual pecuniary loss resulting from any default under the Assumed Contracts and Assumed Leases.

28.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall have no liabilities for any claims arising or relating to or accruing post-Closing under any of the Assumed Contracts and Assumed Leases, and the Debtor shall have no liabilities for any Assumed Obligations.

29.     Except as provided in the ASA and this Order, the Debtor shall be responsible for all obligations that arise between the Petition Date and Closing Date relating to all Assumed Contracts and Assumed Leases unless otherwise agreed to by and between the Debtor, Successful Bidder and the counterparty to the Assumed Contract and Assumed Lease.

30.     In accordance with sections 365(b)(2) and (f) of the Bankruptcy Code, upon assignment of the Assumed Contracts and Assumed Leases to the Successful Bidder, (i) the Successful Bidder shall have all of the rights of the Debtor thereunder and each provision of such Assumed Contracts or Assumed Lease shall remain in full force and effect for the benefit of Successful Bidder notwithstanding any provision in any such Assumed Contract or Assumed Lease or in applicable law that prohibits, restricts or limits in any way such assignment or transfer, and (ii) no Assumed Contract or Assumed Lease may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the consummation of the transactions contemplated by the ASA.

31.     Any party to a personal services contract that has not objected to the assignment thereof is deemed to consent to such assignment pursuant to section 365(c) of the Bankruptcy Code to the extent that such contract is an Assumed Contract or Assumed Lease.

32.     The failure of the Debtor or Successful Bidder to enforce, at any time, one of more terms or conditions of any Assumed Contract or Assumed Lease shall not be a waiver of

such terms and conditions or of the Debtor's or Successful Bidder's rights to enforce every term and condition of the Assumed Contracts or Assumed Leases.

33.    Except as provided herein, unless and until an Assumed Contract or Assumed Lease is assumed and assigned pursuant to the terms of this Order, the Successful Bidder shall have no liability under any such Assumed Contract or Assumed Lease; provided, however, that Successful Bidder shall remain solely responsible for all accrued but unpaid costs and obligations arising under such contracts between the Closing Date and the assumption/assignment or rejection date. To avoid doubt, the Debtor and its estate shall not be responsible for any and all accrued but unpaid costs and obligations arising under any Assumed Contract and/or Assumed Lease between the Closing Date and the assumption/assignment or rejection date

34.    Notwithstanding anything set forth herein to the contrary, the Successful Bidder shall have the right to object to the validity of any Lien or Claim or the amount thereof (including, but not limited to, any cure amount) that Successful Bidder agrees to pay or assume herein or pursuant hereto and Debtor shall provide all reasonably requested assistance in prosecuting such objection consistent with the terms hereof and the ASA.

35.    In the event that the Sale does not close, none of the Debtor's executory contracts and leases shall be assumed or rejected by virtue of this Order and shall remain subject to further administration in the Debtor's chapter 11 case.

36.    To the fullest extent permitted by applicable law, the Successful Bidder shall not be deemed to be a joint employer, single employer, co-employer, or successor employer with the Debtor for any purpose or under the laws of the United States, any state, territory, or possession thereof, or the state of Ohio and, except as specifically set forth in the ASA, the Successful Bidder shall not have any obligation to pay any past wages, benefits, or severance pay or extend or make any benefits or benefit programs, including COBRA or any similar laws or regulations,

to any of Debtor's employees or former employees, including any such employees who may become employees of the Successful Bidder.

37.    Nothing in this Order or the ASA authorizes the transfer or assignment of any governmental: (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under relevant police or regulatory law.

38.    Prime Entities shall permit the Debtor, any direct or indirect successor of the Debtor, the Committee and their respective professionals (collectively, the "Permitted Parties") access to all books and records that were used in connection with or otherwise relate to the Debtor's pre-Closing operations that are in the control or possession of the Prime Entities (collectively, the "Business Records") for the purposes of (i) administering the Debtor's chapter 11 bankruptcy case and any liquidating trust or similar structure that may be established pursuant to a plan of liquidation confirmed herein; (ii) assisting any one or more Permitted Parties in connection with or otherwise relating to the any potential causes of action and claims reconciliation process including, without limitation, assessing, resolving, settling and/or otherwise addressing secured, priority, administrative claims and any general unsecured claims that accrue prior to the Closing Date or (iii) compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

39.    The right of access for the Permitted Parties shall include the right of such Permitted Party to obtain from the Prime Entities copies of such documents and records as they may request in furtherance of any of the purposes referred to in paragraph 38 hereof. The Prime Entities shall not dispose of or destroy any of the Business Records transferred to the Prime Entities at Closing before the fifth (5th) anniversary of the Closing Date and will provide the

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 20 of 133

Permitted Parties with at least ninety (90) days written notice before destroying any Business Records after such date. Upon request, the Prime Entities shall provide the Permitted Parties, within such ninety (90) day period, copies of all requested Business Records. The Prime Entities and the Permitted Parties shall reasonably cooperate regarding the access, provision and duplication of the Business Records.

40.    The Prime Entities shall use reasonable efforts to make reasonably available to the Permitted Parties former employees of the Debtor who become employees of the Prime Entities to assist the Permitted Parties in connection with effectuating the purposes set forth in paragraph 38 hereof.

41.    Notwithstanding anything to the contrary under applicable state and federal law, upon the Closing the Debtor shall not be required to maintain any of the Patient Records or Business Records sold to the Successful Bidder except as expressly provided in the ASA.

42.    The Debtor is hereby authorized to (a) take all other and further actions as may be reasonably necessary consummate and implement the Sale; (b) perform all obligations under the ASA, and (c) execute all other documents and instruments related to and connected with the Sale and the consummation thereof, all without any further corporate action or order of the Court.

43.    The Debtor and the Successful Bidder shall communicate on a regular basis regarding their respective efforts to satisfy the conditions to Closing set forth in the ASA and shall provide reasonable updates to the Committee. If it becomes apparent that the parties will be unable to satisfy any condition to Closing set forth in the ASA, the parties shall promptly notify each other, the Committee, and, if necessary, this Court.

44.    The Court has reviewed the Amended CMS Stipulation and hereby approves same, and the terms contained therein. Therefore, the CMS Objection is hereby deemed MOOT.

45.    In resolution of the Objection of Walnut Grove NH LLC to Assumption and Assignment of Executory Contract (Docket No. 164), the Debtor, the Successful Bidder and

Walnut Grove shall work in good faith to address to Walnut Grove's reasonable satisfaction and within a reasonable timeframe after the Closing the following issues relating to condition of the premises: (i) maintenance of certain air conditioning units in rooms 100, 112, 200, 203, 205, 208 and the second floor nurses station; and (ii) cleaning of carpets, waxing and buffing of office and dining room floors, and the cleaning of rooms.

46.     Notwithstanding the provisions of the ASA to the contrary, any funds received by the Debtor relating to the Grant Agreement Between Appalachian Regional Commission and the Debtor Coshocton County Memorial Hospital (the "Grant"), to the extent awarded, shall be remitted to the Successful Bidder upon receipt subject to the restrictions in the Grant; provided, however that if prior to Closing the Successful Bidder provides the requisite funds to the Debtor for the remaining purchase price of the relevant equipment subject to the Grant, such funds shall not be paid back to Successful Bidder in the event that Successful Bidder does not close the transaction pursuant to the ASA.

47.     Except as otherwise expressly provided in this Order, the rights of the parties filing the Cure Objections and the rights of the Debtor and the Committee to respond to such Cure Objections are reserved in accordance with the Supplemental Assignment Notice and this Order.

48.     To the extent there are any inconsistencies between the terms of this Order, the ASA, and any prior order or pleading with respect to the Sale Motion in the Debtor's chapter 11 case (other than the Genesis Agreed Order), the terms of this Order shall govern. With respect to the Genesis Agreed Order, nothing herein shall be deemed to limit the rights reserved therein.

49.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, or 9014, or otherwise, the provisions of this Order shall be immediately effective and enforceable upon its entry.

# # #

Prepared by:

Sean D. Malloy (0073157)
Michael J. Kaczka (0076548)
Maria G. Carr (0092412)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:  (216) 348-5400
Facsimile:   (216) 348-5474
E-mail:  smalloy@mcdonaldhopkins.com
         mkaczka@mcdonaldhopkins.com
         mcarr@mcdonaldhopkins.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION

# **<u>EXHIBIT 1</u>**

# ASSET SALE AGREEMENT

This Asset Sale Agreement (the "Agreement") is made and entered into as of the 30th day of June, 2016 (the "Signing Date") by and among Coshocton County Memorial Hospital Association, an Ohio non-profit corporation ("Seller"), on the one hand, and Prime Healthcare Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under §501(c)(3) of the Code ("PHS"), and Prime Healthcare Foundation-Coshocton, LLC, a Delaware limited liability company ("Prime-Coshocton" and together with PHS and their respective permitted assignee(s), "Purchaser"), on the other hand.

## R E C I T A L S:

A.     Seller engages in the business of delivering acute care services to the public (the "Business") through the operation of the acute care hospital known as Coshocton County Memorial Hospital located at 1460 Orange Street, Coshocton, Ohio 43812, as well as through the medical office buildings and clinics owned and operated by Coshocton Memorial Hospital as specified on **Schedule A** (collectively, the "Hospital").

B.     Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of the assets owned by Seller and used with respect to the operation of the Hospital, for the consideration and upon the terms and conditions contained in this Agreement.

C.     Seller contemplates on or about June 30, 2016 filing a voluntary petition for relief (the "Petition") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court (the "Bankruptcy Court").

D.     Seller contemplates entering into a Consulting Services Agreement ("Consulting Agreement") with an affiliate of Purchaser, Prime Healthcare Management, Inc., in the form attached hereto as Exhibit A.

E.     Seller and PHS contemplate that upon obtaining approval of the Bankruptcy Court, PHS shall extend debtor in possession financing in accordance with the Senior Secured Debtor in Possession Loan Agreement (the "DIP Loan Agreement") in accordance with Section 6.3 hereof.

F.     The Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets by the Bankruptcy Court pursuant to §363 of the United States Bankruptcy Code, 11 U.S.C. §101-1532 (the "Bankruptcy Code").

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

{6201998:}

# ARTICLE 1

## DEFINITIONS; SALE AND TRANSFER OF ASSETS;
## CONSIDERATION; CLOSING

1.1    <u>Definitions</u>.  Certain terms listed below are defined elsewhere in this Agreement and, for ease of reference; the section containing the definition of each such term is set forth opposite such term.  Failure to list a term does not invalidate its definition.

| Term | Section |
| --- | --- |
| Accounts Receivable | §1.7(h) |
| Affiliate | §4.6(c) |
| Aggregate Damage | §1.13(a) |
| Agreement | Preamble |
| Allocation Schedule | §12.1(b) |
| Assets | §1.7 |
| Assignment Election | §1.11(a) |
| Assignment Notice | §1.11(c) |
| Assumed Contracts | §1.7(e) |
| Assumed Leases | §1.7(d) |
| Assumed Obligations | §1.9 |
| Audit Periods | §2.7(d) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bills of Sale | §1.4.1 |
| Business | Recitals |
| Cash Purchase Price | §1.2 |
| Casualty Termination Notice | §1.13(a) |
| Casualty Termination Notice Period | §1.13(a) |
| CEO | §2.9 |
| CFO | §2.9 |
| Closing | §1.3 |
| Closing Date | §1.3 |
| Closing of Financials | §10.3 |
| CNO | §2.9 |
| COBRA Coverage | §5.3(d) |
| Code | §2.11(b) |
| Confidential Information | §5.5(a) |
| Consulting Agreement | Recitals |
| Consulting Services | §4.2(d) |
| Contract and Lease Consents | §2.5(d) |
| Cure Costs | §5.16 |
| Decision Date | §1.13(d) |
| Designation Deadline | §1.11(a) |
| DIP Financing | §6.3 |

| Term | Section |
|------|---------|
| DIP Loan ................................................... | §6.3 |
| DIP Loan Agreement.............................. | Recitals |
| Document Retention Period............................. | §10.2(a) |
| Effective Time................................................. | §1.3 |
| Environmental Laws ...................................... | §2.5(c) |
| Environmental Permits ................................... | §2.5(b) |
| ERISA ............................................................. | §2.9 |
| Evaluated Contracts ...................................... | 1.11(b) |
| Evaluation Notice........................................... | §1.11(b) |
| Excluded Asset Due Date ............................. | §10.1 |
| Excluded Assets ............................................. | §1.8 |
| Excluded Contracts ....................................... | §1.8(c) |
| Excluded Leases ............................................ | §1.8(d) |
| Excluded Liabilities ...................................... | §1.10 |
| Financial Statements ..................................... | §2.9 |
| Government Authorization ............................ | §8.1 |
| Hazardous Substances ................................... | §2.5(c) |
| Hired Employees ........................................... | §5.3(a) |
| Hospital ......................................................... | Recitals |
| Hospital Employees ...................................... | §5.3(a) |
| Interim Financials ......................................... | §2.9 |
| Inventory ....................................................... | §1.7(f) |
| Lease Amounts............................................... | 1.6.3 |
| Leased Real Property .................................... | §1.7(d) |
| Leasehold Title Policy .................................. | §4.8 |
| Licenses......................................................... | §1.7(c) |
| Loss Consultant............................................. | §1.13(a) |
| Owned Real Property .................................... | §1.7(a) |
| Owner's Title Policy ..................................... | §4.8 |
| Permitted Exceptions .................................... | §8.6 |
| Person............................................................ | §4.6(c) |
| Personal Property .......................................... | §1.7(b) |
| Petition.......................................................... | Recitals |
| PHS................................................................ | Preamble |
| Post-Effective Time CFO.............................. | §10.3 |
| Power of Attorney ......................................... | §1.4.8 |
| Pre-Effective Time Lease Amounts | §1.6.3 |
| Prepaids......................................................... | §1.7(g) |
| Prime-Coshocton............................................ | Preamble |
| Purchase Price ............................................... | §1.2 |
| Purchaser....................................................... | Preamble |
| Real Estate Assignment(s) ............................ | §1.4.2 |
| Real Property ................................................. | §1.7(a) |
| Receivable Records....................................... | §1.7(i) |

{6201998:}

3

| Term | Section |
| --- | --- |
| Rejected Contracts | §1.11(c) |
| Rejection Notice | §1.11(c) |
| Sale Hearing | §1.11(a) |
| Sale Motion | §6.1(b) |
| Sale Order | §6.1(b) |
| Seller | Preamble |
| Seller Cost Reports | §12.2(a) |
| Seller Plans | §2.11(a) |
| Seller's Affidavit | §4.8 |
| Signing Date | Preamble |
| Submittal Date | §1.13(d) |
| Subsequently Assigned Contracts | §1.11(c) |
| Subsequently Assigned Leases | §1.11(c) |
| Supplemental Payments | §1.7(k) |
| Surveys | §4.8 |
| Termination Date | §9.1(h) |
| Title Commitment | §4.8 |
| Title Company | §4.8 |
| Title Instruments | §4.8 |
| Title Policy | §4.8 |
| Unpaid Amounts | §1.6.3 |
| Utility Deposits | §1.8(j) |

    1.2    <u>Purchase Price</u>.  Subject to the terms and conditions of this Agreement, the aggregate purchase price to be paid by Purchaser to Seller for the purchase of the Assets shall be Ten Million Dollars ($10,000,000), plus Cure Costs as provided for in Section 5.16 hereof, plus the amount of accrued and unpaid fees under the Consulting Agreement as of the Closing Date (the "Purchase Price"). The Purchase Price will be reduced by the balance due under the DIP Loan as of the Closing Date (the resulting amount, the "Cash Purchase Price"), which DIP Loan shall be deemed satisfied by such Purchase Price reduction. The payment of the Cash Purchase Price at Closing shall be governed by <u>Section 1.5.1.</u>

    1.3    <u>Closing Date</u>.  The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at 9:00 a.m. local time at the offices of Shulman Hodges & Bastian LLP, 100 Spectrum Center Drive, Suite 600, Irvine California 92618 within thirty (30) days of entry of the Sale Order as provided in Section 8.2 hereof, anticipated to be in the 3rd quarter of 2016, or such other date, time and place as the parties shall mutually agree  (the day on which Closing actually occurs, the "Closing Date"), subject to the satisfaction or waiver of the conditions set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u>, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions. The Closing shall be deemed to occur and to be effective as of 12:00:01 a.m. Eastern time on the day immediately after the Closing Date (the "Effective Time").

1.4　Items to be Delivered by Seller at Closing. At or before the Closing, Seller shall deliver, or cause to be delivered, to Purchaser the following:

1.4.1　General Assignment, Bill of Sale and Assumption of Liabilities substantially in the form of **Exhibit 1.4.1** attached hereto (the "Bills of Sale"), duly executed by Seller;

1.4.2　Assignment and Assumption Agreements (the "Real Estate Assignments") in the form of **Exhibit 1.4.2** attached hereto with respect to (i) the Leased Real Property, and (ii) the Tenant Leases, each duly executed by Seller;

1.4.3　Quitclaim Deed(s) in the form of **Exhibit 1.4.3** attached hereto, duly executed by Seller;

1.4.4　favorable original certificates of good standing, or comparable status, of Seller, issued by the State of Ohio, dated no earlier than a date which is seven (7) calendar days prior to the Closing Date;

1.4.5　a duly executed certificate of the Chief Executive Officer or Chief Financial Officer of Seller certifying to Purchaser that, to the knowledge of such person, the covenants of Seller set forth in ARTICLE 8 have been satisfied or waived;

1.4.6　a duly executed certificate of an officer of Seller certifying to Purchaser (i) the incumbency of the officers of Seller on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions of (A) the Board of Directors of Seller authorizing (I) the transfer of the Assets and transfer of the Assumed Obligations by Seller to Purchaser and (II) the due execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.4.7　Uniform Commercial Code termination statements for any and all financing statements, to the extent not previously terminated;

1.4.8　Limited Power of Attorney for use of DEA and Other Registration Numbers and DEA Order Forms, in the form of **Exhibit 1.4.8** attached hereto (the "Power of Attorney"), duly executed by Seller;

1.4.9　a certified copy of the Sale Order (as defined below); and

1.4.10　such other instruments, certificates, consents or other documents which Purchaser and Seller deem mutually reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.5　Items to be Delivered by Purchaser at Closing. At or before the Closing, Purchaser shall deliver or cause to be delivered to Seller the following:

{6201998:}

5

1.5.1   payment of the Cash Purchase Price plus payment to Seller of all amounts due to Seller under Section 1.6;

1.5.2   a duly executed certificate of the President or any Vice President of Purchaser certifying to Seller that, to the knowledge of such person, the covenants of Purchaser set forth in ARTICLE 7 have been satisfied or waived;

1.5.3   a duly executed certificate of the Secretary of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the sole member and sole manager of each Purchaser, as applicable, authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.4   favorable original certificate of good standing, or comparable status, of Purchaser, issued by each of the Ohio and Delaware Secretaries of State dated no earlier than a date which is seven (7) calendar days prior to the Closing Date;

1.5.5   the Bills of Sale, duly executed by Purchaser;

1.5.6   the Real Estate Assignment(s), duly executed by Purchaser;

1.5.7   the Power of Attorney, duly executed by Purchaser; and

1.5.8   such other instruments, certificates, consents or other documents which Purchaser and Seller deem mutually and reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6   Prorations and Utilities.   All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the foregoing principles and the rules for the specific items set forth hereafter:

1.6.1   All transfer, conveyance, sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of, and allocated to, Purchaser.

1.6.2   Other than the Utility Deposits which are governed by Section 1.8(j), real estate and personal property lease payments, real estate and personal property taxes, real estate assessments and other similar charges against real estate, and power and utility charges (collectively, the "Prorated Charges") on the Assets shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable. Seller shall pay at or prior to the Closing (or Purchaser shall receive credit for) any unpaid Prorated Charges attributable to periods or portions thereof occurring prior to the Effective Time, and Purchaser shall pay to Seller at the Closing all Prorated Charges attributable to periods or portions thereof occurring from and after the Effective Time. In the event that as of the Closing Date the actual

tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used. The parties agree that if the real estate and personal property taxes prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing. As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by equally by Purchaser and Seller.

        1.6.3    Seller shall be entitled to all rents and other payments under Tenant Leases accruing for the period prior to the Effective Time ("Pre Effective Time Lease Amounts"), and Purchaser shall be entitled to all rents and other payments under tenant leases accruing for the period after the Effective Time ("Post Effective Time Lease Amounts" and together with the Pre Effective Time Lease Amounts, the "Lease Amounts"). All Lease Amounts that are collected prior to the Closing shall be prorated as of the Closing in accordance with the immediately preceding sentence. All Lease Amounts that are accrued but unpaid as of the Closing (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) (collectively, the "Unpaid Amounts") shall belong to Seller, and Purchaser shall, upon receipt of said rents and other payments, receive the same in trust for Seller and shall promptly remit any of such amounts to Seller within ten (10) days after Purchaser's receipt of same.

        1.6.4    All prorations and payments to be made under the foregoing provisions shall be agreed upon by Purchaser and Seller prior to the Closing and shall be binding upon the parties; provided, however, with respect to the Unpaid Amounts, in the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This section 1.6.4 shall survive Closing.

        1.7    <u>Transfer of Seller Assets</u>. On the Closing Date and subject to the terms and conditions of this Agreement, Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens and encumbrances other than the Permitted Exceptions, and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date, with respect to the operation of the Hospital, to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time (collectively, the "Assets"):

        (a)    all of the real property that is owned by Seller and used with respect to the operation of the Hospital, all of which real property is set forth on **Schedule 1.7(a)**, together with all buildings, improvements and fixtures located thereupon, including, without limitation, all buildings and other improvements then under construction (collectively, the "Owned Real Property" and together with the Leased Real Property, the "Real Property);

(b)     all of the tangible personal property owned by Seller and used by Seller in the operation of the Hospital, including equipment, furniture, machinery, vehicles and office furnishings, (the "Personal Property"), including, without limitation, the Personal Property set forth on **Schedule 1.7(b)**;

(c)     all of Seller's rights, to the extent assignable or transferable, to all licenses, provider numbers, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller for use in the operation of the Hospital (the "Licenses"), including, without limitation, the Licenses and Medicare Provider Numbers set forth on **Schedule 1.7(c)**;

(d)     all of Seller's interest, to the extent assignable or transferable, in and to all of the following (the "Assumed Leases"): (i) personal property leases with respect to the operation of the Hospital that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to Section 1.11 herein or set forth on **Schedule 1.7(d)(i)** (the "Personal Property"), (ii) the real property leases for all real property leased by Seller and set forth on **Schedule 1.7(d)(ii)** (the "Leased Real Property"), and (iii) the real property owned by Seller and leased to a third party and set forth on **Schedule 1.7(d)(iii)** (the "Tenant Leases");

(e)     all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect to the operation of the Hospital that have been designated by Purchaser as a contract to be assumed pursuant to Section 1.11 (the "Assumed Contracts");

(f)     to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital or (ii) used in the operation of the Hospital (the "Inventory") except as set forth in Section 1.8 (e);

(g)     other than Utility Deposits, all prepaid rentals, deposits, prepayments and similar amounts relating to the Assumed Contracts and/or the Assumed Leases, which were made with respect to the operation of the Hospital (the "Prepaids"), the current categories and amounts of which are set forth on **Schedule 1.7(g)**;

(h)     subject to Section 5.19, to the extent assignable or transferable, all accounts, notes, interest and other receivables of Seller, including accounts, notes or other amounts receivable from physicians, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, disproportionate share payments and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Seller prior to the Effective Time whether payable by Medicare, Ohio Medicaid, TRICARE, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "Accounts Receivable");

(i)     to the extent assignable or transferable, all documents, records, correspondence, work papers and other documents, other than patient records, relating to the Accounts Receivable (the "Receivable Records");

(j)     to the extent assignable or transferable, (i) all rights, claims and causes of action of Seller related to and/or arising out of the Accounts Receivable and rights to settlements and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")); and (ii) causes of action under Sections 544, 547, 548, and 550 of the Bankruptcy Code against the parties listed on **Schedule 1.7(j)**;

(k)     all Hospital Care Assurance Program ("HCAP") payments and payments from the State of Ohio or any of its administrative entities or other entitles to support the Business and/ or the Hospital    (together with Medicare and Ohio Medicaid supplemental payments, the "Supplemental Payments") received on and after the Effective Time regardless of the State fiscal year for which the Supplemental Payments are made in reference to and regardless of the State fiscal year for which the data was derived to calculate eligibility for such payments.  The parties acknowledge that Supplemental Payments are made to an eligible hospital for a state fiscal year, and that payments for a particular state fiscal year may be made during or after such state fiscal year.  Notwithstanding the foregoing, the parties hereby confirm that it is the express intent of the parties that Purchaser shall receive the benefit of all Supplemental Payments received on and after the Effective Time regardless of whether the payments are made in reference to a State fiscal year prior to the Effective Time;

(l)     to the extent assignable or transferrable, all of the following that are not proprietary to Seller and/or Seller's affiliates:  operating manuals, files and computer software with respect to the operation of  the Hospital, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; *provided, however,* that any patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time shall be an Excluded Asset;

(m)     to the extent assignable or transferable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(n)     the right to use the name "Coshocton County Memorial Hospital" and all names for related entities;

(o)     all goodwill of the Hospital evidenced by the Assets;

(p)     the Hospital's website(s) together with certain content therein;

(q)     to the extent transferable or assignable, Seller's right or interest in the telephone and facsimile numbers used with respect to the operation of the Hospital;

(r)     the names and symbols of the Hospital set forth on **Schedule 1.7(r)**;

(s)     to the extent assignable or transferable, Seller's Medicare and Medicaid provider numbers and Lock Box Account(s) subject to approval by the appropriate governmental and regulatory agencies; and

(t)     except for the Excluded Assets, to the extent assignable or transferable, any other assets owned by Seller with respect to the operation of the Hospital (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the Hospital.

1.8     Excluded Assets. Notwithstanding anything to the contrary in Section 1.7, Seller shall retain all assets owned directly or indirectly by it (or any of Seller's affiliates) which are not among the Assets, including, without limitation, the following assets of Seller (collectively, the "Excluded Assets"):

(a)     cash, cash equivalents and short-term investments;

(b)     all Seller Plans and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets related to Seller's 457 plan and/or assets representing a surplus or overfunding of any Seller Plan;

(c)     all contracts that are not Assumed Contracts (the "Excluded Contracts");

(d)     all leases that are not Assumed Leases (the "Excluded Leases");

(e)     the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f)     assets owned and provided by vendors of services or goods to the Hospital;

(g)     all of Seller's organizational or corporate record books, minute books and tax records;

(h)     all causes of action of Seller or Seller's bankruptcy estate (including parties acting for or on behalf of Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Case) not specifically set forth in Section 1.7(j) hereof, including causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of the Seller's bankruptcy estate, including, but not limited to, liens attaching to the Cash Purchase Price paid to the Seller, and the proceeds from any of the foregoing; provided, however that Purchaser shall acquire and be deemed to release and waive as of the Effective Time causes of

action under Sections 544, 547, 548, and 550 of the Bankruptcy Code against the parties listed on **Schedule 1.7(i)**;

   (i) all insurance policies and contracts and coverages obtained by Seller or listing Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date;

   (j) all deposits made with any entity that provides utilities to the Hospital (the "Utility Deposits");

   (k) all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assumed Contract or Assumed Lease;

   (l) all unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

   (m) all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by Seller to any third party with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by Seller or Seller's consultants);

   (n) all bank accounts of Seller;

   (o) all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

   (p) the rights of Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

   (q) all director and officer insurance;

   (r) all tax refunds of Seller;

   (s) all documents, records, operating manuals and film pertaining to the Hospital that the parties agree that Seller is required by law to retain;

   (t) all patient records and medical records which are not required by law to be maintained by Seller as of the Effective Time;

   (u) all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

   (v) the rights of Seller and its affiliates under this Agreement; and

       (w)     any assets identified in **Schedule 1.8(w)**.

       1.9     <u>Assumed Obligations</u>.  On the Closing Date, Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of Seller and only the following liabilities and obligations (collectively, the "Assumed Obligations"):

       (a)     the Assumed Contracts and all liabilities of Seller under the Assumed Contracts, including Cure Amounts;

       (b)     the Assumed Leases and all liabilities of Seller under the Assumed Leases, including Cure Amounts;

       (c)     all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

       (d)     the accrued payroll not to exceed one (1) payroll cycle per Hired Employee;

       (e)     the accrued paid time off pay up to a maximum of 300 hours per Hired Employee;

       (f)     all liabilities and obligations of Seller related to the Hired Employees arising on or following the Closing Date;

       (g)     all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in <u>Section 1.6</u>;

       (h)     all liabilities and obligations relating to utilities being furnished to the Assets, subject to the prorations provided in <u>Section 1.6</u>;

       (i)     any documentary, sales and transfer tax liabilities of Seller incurred as a result of the consummation of the transaction contemplated by this Agreement;

       (j)     any and all liabilities and obligations arising under the law or bankruptcy court order(s) relating to any collective bargaining agreement or other contract with any labor union or labor relations entity applicable to and/or covering employees of the Hospital;

       (k)     all liabilities or obligations provided for in <u>Section 5.3</u>;

       (l)     all liabilities and obligations of Seller arising or relating to (i) Accounts Receivable, including under any Seller Cost Reports, excluding liabilities set forth in <u>Section 1.10(c)</u>, (ii) Receivable Records, and (iii) rights, claims, and causes of action related to and/or arising out of the Accounts Receivable and rights to settlement and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, whether open or closed, arising

from or against the United States government under the terms of the Medicare program or TRICARE (formerly CHAMPUS); and

        (m)     any other obligations and liabilities identified in **Schedule 1.9(m)**.

    1.10    <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in Section 1.9, Purchaser shall not assume or become responsible for any of Seller's duties, obligations or liabilities that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bills of Sale or the Real Estate Assignment(s) (the "Excluded Liabilities"), and Seller shall remain fully and solely responsible for all of Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bills of Sale or in the Real Estate Assignment(s). The Excluded Liabilities shall include, without limitation:

        (a)     any liabilities of Seller with respect to the operation of the Hospital prior to the Effective Time that are not otherwise specifically included in the Assumed Obligations;

        (b)     all liabilities of Seller arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Seller of the Hospital or any of the Assets prior to the Effective Time, other than as specifically included in the Assumed Obligations;

        (c)     all liabilities of Seller in connection with claims of professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time;

        (d)     all liabilities of Seller for its share of matching contributions for eligible beneficiaries' 401(k) plans, Section 125 plans and other Seller Plans and all administrative costs associated with such welfare benefit plans arising prior to the Effective Time;

        (e)     all liabilities of Seller for violations of any law, regulation or rule to the extent arising from acts or omissions of Seller prior to the Closing Date, including, without limitation, those pertaining to Medicare and Ohio Medicaid fraud or abuse;

        (f)     all liabilities of Seller under the Excluded Contracts;

        (g)     all liabilities of Seller under the Excluded Leases;

        (h)     all liabilities of Seller for commissions or fees owed to any finder or broker in connection with the transactions contemplated hereunder;

        (i)     all liabilities of Seller or any of Seller's affiliates for any stay-bonus payments to the Hospital Employees to provide an incentive to the Hospital Employees to remain employed at the Hospital through the Effective Time;

16-51552-amk   Doc 207   FILED 10/03/16   ENTERED 10/03/16 16:33:22   Page 37 of 133

(j)     all liabilities of Seller or any of Seller's affiliates for any severance payments owed to any Hospital Employees if the event that gives rise to the obligation to pay severance occurs prior to the Closing Date;

(k)     all liabilities of Seller related to any risk pools to which Seller is a party;

(l)     All liabilities for employee health care prior to the Effective Time, including but not limited to, Hospital's portion as a self insured of employee healthcare claims; and

(m)     other than as set forth in Section 5.3, all liabilities of Seller or any of Seller's affiliates to any of the employees of Seller who are not Hospital Employees.

1.11    Designation of Assumed Contracts and Assumed Leases.

(a)     No later than ten (10) days prior to the Sale Hearing (the "Closing Designation Date"), Purchaser may designate by delivery of a written election (each, an "Assignment Election") to Seller (such notice to be signed and dated by Purchaser) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time. Subject to Section 4.4.2, Purchaser and Seller shall cause each of the contracts and leases for which Purchaser delivers an Assignment Election prior to the Closing Designation Date to be assumed and assigned to Purchaser at Closing. "Sale Hearing" means the hearing (or hearings) of the Bankruptcy Court to approve the transactions contemplated by this Agreement.

(b)     No later than ten (10) days prior to the Sale Hearing, Purchaser shall designate in a written notice signed and dated by Purchaser (the "Evaluation Notice") to Seller any contracts and leases not already identified pursuant to Subsection 1.11(a) above that Purchaser, in its sole and absolute discretion, desires to evaluate for potential assumption by Seller and assignment to Purchaser (collectively, the "Evaluated Contracts"). Purchaser may not list more than five (5) contracts or leases as Evaluated Contracts.

(c)     No later than thirty (30) days after the Closing Date (the time from the Closing Date to such date, the "Evaluation Period"), (i) Purchaser shall notify Seller in writing (each, an "Assignment Notice") of which Evaluated Contracts are to be assumed by Seller and assigned to Purchaser (collectively, the "Subsequently Assigned Contracts" or "Subsequently Assigned Leases" as the case may be) and (ii) Purchaser shall notify Seller in writing signed and dated by Purchaser (each a "Rejection Notice") of which Evaluated Contracts are to be rejected by Seller (collectively, the "Rejected Contracts"). Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that Final Orders (x) assuming and assigning the Subsequently Assigned Contracts or Subsequently Assigned Leases to Purchaser are entered and (y) rejecting the Rejected Contracts are entered. Regardless of whether an Evaluated Contract becomes a Subsequently Assigned Contract, Purchaser shall pay in advance all obligations of Seller under the Evaluated Contracts during the Evaluation Period and any time thereafter required for Bankruptcy Court approval of rejection or assumption and assignment of the Evaluated Contract. It is the intent of the parties that Seller shall have no

{6201998:}                                        14

monetary exposure for any Evaluated Contract after the Closing Date. Notwithstanding anything to the contrary set forth in this Agreement, the Subsequently Assigned Contracts or Subsequently Assigned Leases, as the case may be, shall constitute Assigned Contracts or Assigned Leases pursuant to, and as defined in, this Agreement, and Purchaser shall pay all Cure Costs with respect thereto. With respect to each Subsequently Assigned Lease, Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease. Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.

      1.12    <u>Disclaimer of Warranties; Release</u>.

      (a)    EXCEPT AS EXPRESSLY SET FORTH IN <u>ARTICLE 2</u> HEREOF, THE ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLER AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF SELLER SPECIFICALLY SET FORTH IN <u>ARTICLE 2</u>, ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLER INCLUDED IN THE ASSETS AND THE ASSUMED OBLIGATIONS ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

      (b)    Purchaser acknowledges that Purchaser will be examining, reviewing and inspecting all matters which in Purchaser's judgment bear upon the Assets, the Seller and the Hospital and their value and suitability for Purchaser's purposes and, except as affirmatively represented and warranted by Seller in <u>ARTICLE 2</u>, is relying solely on Purchaser's own examination, review and inspection of the Assets and Assumed Obligations. Except to the extent of any representation made by Seller in <u>ARTICLE 2</u>, Purchaser releases Seller and its affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the Assets, or their suitability for any purpose whatsoever.

      1.13    <u>Risk of Loss</u>. The risk of loss or damage to any of the Assets, Personal Property, Owned Real Property, the Hospital and all other property, the transfer of which is contemplated by this Agreement, shall remain with Seller until the Effective Time and Seller shall maintain such insurance policies of Seller as are in effect at the Signing Date, or comparable policies of

insurance or self-insurance covering the Assets, the Hospital and all other property through the Effective Time.

(a)     With respect to the Real Property, if prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where such damage or destruction is in the aggregate (the "Aggregate Damage") less than or equal to fifteen percent (15%) of the Purchase Price, the parties' duties and obligations under this Agreement shall not be affected and the Closing shall proceed as scheduled; *provided, however,* Seller shall retain any and all insurance proceeds and other or similar third party recompense on accounts of such damage or destruction and the Aggregate Damages (up to fifteen percent (15%) of the Purchase Price) shall be deducted from the Purchase Price.  If prior to the Closing, all or any part of the Real Property is destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price, then either of Seller or Purchaser, in the exercise of its sole discretion, may elect to terminate this Agreement by written notice to the other (the "Casualty Termination Notice") delivered after the date which is fifteen (15) calendar days after the occurrence of such damage or destruction but no later than the date which is thirty (30) calendar days after the occurrence of such damage or destruction (the "Casualty Termination Notice Period"); *provided, however,* that in no event shall the Casualty Termination Notice be provided if Seller and Purchaser are unable to agree prior to the inception of the Casualty Termination Notice Period that the amount of the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price. If Purchaser and Seller are unable to agree upon the amount of the Aggregate Damage by the earlier to occur of (I) August 31, 2016 or (II) the inception of the Casualty Termination Notice Period, the amount of the Aggregate Damage shall be determined by Centex Rodgers, Inc. (the "Loss Consultant") pursuant to Section 1.13(d).  If this Agreement is not terminated by Casualty Termination Notice pursuant to this Section, then the Aggregate Damage either as agreed by the parties or as established pursuant to Section 1.13(d) shall be deducted from the Purchase Price and Seller shall retain any and all insurance proceeds and other similar third party recompense; *provided, however,* that in no case shall the deduction from the Purchase Price exceed fifteen percent (15%) of the Purchase Price.

(b)     With respect to any Assets other than Real Property which are destroyed or damaged by fire or the elements or by any other cause prior to the Closing (ordinary wear and tear excepted), if the aggregate amount of the cost of such damages exceeds 15% of the Purchase Price, Seller will deduct from the Purchase Price the cost to repair, restore and/or replace the Assets other than the Real Property (using the lesser of cost of repair, restore or replace as applicable), and Seller will be entitled to any and all insurance proceeds and other or similar third party recompense for such destruction or damage.

(c)     If prior to the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain proceeding which would in Purchaser's reasonable judgment materially adversely impair access to the Real Property or be materially adverse to the operation of the Hospital, Purchaser may elect, within thirty (30) days of notice of the institution of such eminent domain proceeding to (i) purchase such affected Owned Real Property, or take assignment of such Leased Real Property, and the Closing shall proceed as scheduled (*provided, however,* at the Closing Seller shall assign, transfer and set over to Purchaser all of Seller's right,

title and interest in and to any award in such eminent domain proceeding) or (ii) elect to terminate this Agreement by written notice to Seller.

(d)     If pursuant to either Section 1.13(a) or 1.13(c) the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant, within five (5) calendar days after the earlier to occur of the August 31, 2016 or the inception of the Casualty Termination Notice Period (the "Submittal Date"), each party shall submit to the other party and to the Loss Consultant its proposed Aggregate Damage (and any applicable Purchase Price adjustment) as a result of the event(s) contemplated by either Section 1.13(a) or 1.13(c), along with a detailed description of the basis for such amount and any applicable adjustment.   Within ten (10) calendar days after the Submittal Date (the "Decision Date"), the Loss Consultant, acting as an expert and not as an arbitrator, shall select either the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Seller or the Aggregate Damage (and any applicable Purchase Price adjustment) proposal of Purchaser as the definitive amount of the Aggregate Damage (and any applicable adjustment to the Purchase Price) and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price. If either Purchaser or Seller fails to timely provide its proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, the Aggregate Damage (and any applicable Purchase Price adjustment) shall be the amount proposed by the submitting party, and Purchaser or Seller shall thereafter have the right to provide a Casualty Termination Notice provided that the Aggregate Damage exceeds fifteen percent (15%) of the Purchase Price.   If neither party submits its proposed Aggregate Damage (and any applicable Purchase Price adjustment) to the Loss Consultant, no adjustment to the Purchase Price shall be made and neither Purchaser nor Seller shall have the right to provide a Casualty Termination Notice. The decision of the Loss Consultant shall be conclusive and binding as between Purchaser and Seller (absent manifest error), and the costs of such review shall be borne by the party whose proposed Aggregate Damage (and any applicable Purchase Price adjustment) is not selected by the Loss Consultant. Upon any such determination of the adjustment to the Purchase Price in accordance with this Section 1.13, the parties shall, subject to the terms and conditions of this Agreement, consummate the transactions contemplated by this Agreement at a mutually agreeable time and place, in accordance with the provisions of this Agreement. If pursuant to either Section 1.13(a) or 1.14(c), the amount of the Aggregate Damage (and any applicable Purchase Price adjustment) is to be determined by the Loss Consultant and either the Submittal Date or the Decision Date falls on a day which is on or after the Termination Date, then the Termination Date shall be extended to the date which is ten (10) calendar days after the Decision Date.

16-51552-amk     Doc 207     FILED 10/03/16     ENTERED 10/03/16 16:33:22     Page 41 of 133

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents, warrants and covenants to Purchaser as to the following matters, except as disclosed in the disclosure schedule as of the Signing Date, as may be amended pursuant to the terms of this Agreement (the "Disclosure Schedule") hereby delivered by Seller to Purchaser:

2.1     Authorization.  Seller has all necessary power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, to carry out the transactions contemplated hereby.

2.2     Binding Agreement.  Except as set forth on **Schedule 2.2**, all actions required to be taken by Seller to authorize the execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly and properly taken or obtained by Seller. Except as set forth on **Schedule 2.2**, no other corporate or other action on the part of Seller is necessary to authorize the execution, delivery, and performance of this Agreement and all other agreements contemplated hereby.  This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

2.3     Organization and Good Standing; No Violation.

(a)     Seller is a non-profit corporation duly organized, validly existing and in good standing under the laws of the State of Ohio.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)     Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller, will violate, conflict with or result in a breach of any material provision of Seller's articles of incorporation or bylaws or any other organizational documents of Seller.

2.4     Required Consents.  Except as set forth on **Schedule 2.4**, Seller is not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, lease, or contract or any material order, judgment or decree which (a) requires the consent of another to the execution of this Agreement or (b) requires the consent of another to consummate the transactions contemplated by this Agreement.

{6201998:}

18

2.5     Compliance With Laws and Contracts.

(a)     Except as set forth in **Schedule 2.5(a)**, to Seller's knowledge, Seller, with respect to the operation of the Hospital, is in compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise), except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  Except as set forth in **Schedule 2.5(a)** and except as would not have a material adverse effect on the Hospital or the business of the Hospital, Seller, with respect to the operation of the Hospital, has not been charged in writing with or been given written notice of, and to the knowledge of Seller, Seller, with respect to the operation of the Hospital, is not under investigation with respect to, any violation of, or any obligation to take remedial action under, any applicable (i) law, statute, ordinance, rule, regulation, policy or guideline promulgated, (ii) license or certificate issued, or (iii) order, judgment or decree entered, by any federal, state, local or foreign court or governmental authority relating to the Hospital or the business of the Hospital.  Notwithstanding the foregoing, no provision of this Section 2.5(a) shall be deemed a representation or warranty by Seller as to compliance with any Environmental Laws (as defined in Section 2.5(c) below).

(b)     Except as set forth in **Schedule 2.5(b)**, to Seller's knowledge, Seller's ownership and operation of the Hospital and the Assets are and have been in compliance with all Environmental Laws, except where the failure to be in such compliance would not have a material adverse effect on the Assets or the business of the Hospital.  To Seller's knowledge, Seller has obtained all material licenses, permits and approvals necessary or required under all applicable Environmental Laws (the "Environmental Permits") for the ownership and operation of the Hospital and the Assets.  All such Environmental Permits are in effect and, to Seller's knowledge, no action to revoke or modify any of such Environmental Permits is pending. There is not now pending or, to Seller's knowledge, threatened, any claim, investigation or enforcement action by any governmental authority (whether judicial, executive or administrative) concerning Seller's potential liability under Environmental Laws in connection with the ownership or operation of the Hospital or the Assets.  Except as set forth in **Schedule 2.5(b)**, to Seller's knowledge, there has not been an unlawful release or threatened release of any Hazardous Substance at, upon, in, under or from the Hospital or the Assets at any time.  Except as set forth in **Schedule 2.5(b)**, to Seller's knowledge, no portion of the Real Property has been used as a dump or landfill or a storage, recycling or disposal facility for any Hazardous Substance, other than for the storage and disposal of medical waste in connection with the ordinary course operation of the Hospital.

(c)     For the purposes of this Agreement, the term "Environmental Laws" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste.  For purposes of this Agreement, the term "Hazardous Substances" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various

constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

(d) Except as set forth in **Schedule 2.5(d)**, upon entry of the Sale Order and Purchaser's payment of the Cure Costs, to Seller's knowledge, Seller is not in breach or default, nor do any circumstances exist which with or without notice or lapse of time, or both, would result in breach or default, nor is there any claim of such breach or default with respect to any obligation to be performed, under any material contract, material lease, guaranty, indenture or loan agreement relating to the Assets or the business of the Hospital, which breach or default or its consequences would materially adversely affect the Assets or the business of the Hospital. No provision of this Section 2.5(d) shall apply to any failure to obtain consents to the assignment of the Assumed Contracts and Assumed Leases from the third parties to the Assumed Contracts and Assumed Leases in which consent is required to assign the Assumed Contracts and Assumed Leases to Purchaser (the "Contract and Lease Consents").

2.6     Title; All Assets.  Except as set forth on **Schedule 2.6**:

(a) Seller has good and valid fee simple or leasehold title, as the case may be, to the Real Property, subject to the matters set forth in Section 2.6(b).  Seller has good and valid title to the Personal Property, which individually or in the aggregate is material to the condition (financial or otherwise), operations or the business of the Hospital.

(b) The Real Property and the Personal Property is held by Seller free and clear of all liens, pledges, claims, charges, security interests or other encumbrances, and is not, in the case of the Real Property, subject to any rights-of-way, building or use restrictions, exceptions, variances, reservations or limitations of any nature whatsoever except (i) the Leases, (ii) liens for current real property taxes and assessments, (iii) mechanics', carriers', workmen's, repairmen's and other statutory liens, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title in the Real Property, title insurance coverage has been obtained, (iv) rights of way, building or use restrictions, zoning regulations, exceptions, easements, covenants, variances, reservations, encroachments and other limitations of any kind, if any, which do not materially impair the ordinary business operations of the Hospital or for which, in respect of matters affecting title to the Real Property, title insurance coverage has been obtained, (v) those standard printed exceptions customarily set forth in title reports or title policies (other than exceptions for matters identified in the Surveys with respect to the Real Property), and (vi) other such encumbrances as are set forth in **Schedule 2.6(b)**.  None of the Real Property is subject to a pending, or to Seller's knowledge threatened, condemnation or similar proceeding.

(c) The Inventory with respect to the Hospital is, and at the Closing Date will be maintained in such quantities as is consistent with the Hospital's historical practices.

(d) The Assets and the Excluded Assets comprise substantially all of the property and assets used in the conduct of the operations of the Hospital.  Except as set forth on **Schedule 2.6(d)**, the Owned Real Property and the Leased Real Property comprise all of the real property used in the conduct of the operations of the Hospital.  The parties acknowledge that as

{6201998:}                                        20

of the Signing Date they have not received a Title Commitment for certain of the properties. Accordingly, **Schedule 2.6(b)** may be amended by mutual agreement following receipt of a complete Title Commitment.

      1.2     <u>Certain Representations With Respect to the Hospital</u>.

      (a)     Except as set forth on **Schedule 2.7(a),** all material licenses and certifications which are necessary to operate the business of the Hospital by Seller are valid and in good standing, except where the failure to have such material licenses and certifications would not have a material adverse effect on the Assets or the business of the Hospital. Subject to <u>Section 4.1.2</u>, Seller has previously made available to Purchaser or will promptly deliver after the Signing Date all written correspondence received by Seller from any governmental entity since, or related to uncorrected material deficiencies in, the most recent state licensure or certification survey related to the Hospital.

      (b)     The Hospital is duly accredited by The Joint Commission for the period set forth in **Schedule 2.7(b)**. Subject to <u>Section 4.1</u>, Seller has previously made available to Purchaser or will promptly make available after the Signing Date all written correspondence received by Seller from The Joint Commission since, or related to uncorrected material deficiencies in, the most recent Joint Commission survey related to the Hospital.

      (c)     The Hospital is certified for participation in the Medicare and TRICARE programs, and has current and valid provider contracts with each of such programs, except where the failure to have such contracts would not have a material adverse effect on the business of the Hospital. Except as set forth in **Schedule 2.7(c)**, Seller has not received written notices of any investigations with respect to the operation of the Hospital from the regulatory authorities which enforce the statutory or regulatory provisions in respect of any of the Medicare, Ohio Medicaid or TRICARE programs, and to Seller's knowledge, there are no pending or threatened investigations by Medicare, Ohio Medicaid or TRICARE programs with respect to the operation of the Hospital.

      (d)     Notices of Program Reimbursement have been issued by the applicable fiscal intermediary with respect to the Seller Cost Reports of the Hospital for Medicare and Ohio Medicaid (if required) through the periods set forth in **Schedule 2.7(d)** (the "Audit Periods"). Each of such reports was timely filed. Except as set forth on **Schedule 2.7(d),** to the knowledge of Seller, (i) Seller has not received notice of any material dispute between the Hospital and the applicable governmental agency or private entity, or their intermediaries or representatives, regarding such Seller Cost Reports for periods subsequent to the periods specified in **Schedule 2.7(d)** and (ii) to Seller's knowledge, there are no pending or threatened material claims by any of such programs against the Hospital with respect to the Audit Periods or any period thereafter.

      (e)     Except as set forth on **Schedule 2.7(e)**, with respect to the operation of the Hospital, Seller does not have any outstanding loan, grant or loan guarantee pursuant to the Hill-Burton Act (42 USC Section 291a, *et seq.*).

(f)     Seller, with respect to the operation of the Hospital, has not been excluded from Medicare or any federal or state health care program, and, to Seller's knowledge, there is no pending or threatened exclusion action against Seller with respect to the operation of the Hospital.

1.3     <u>Brokers and Finders</u>.  Except as set forth on **Schedule 2.8**, neither Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

1.4     <u>Financial Statements</u>.  The following have been or will be prepared from the books and records of Seller (a) the audited annual financial statements of Seller with respect to the operation of the Hospital as of December 31, 2013, December 31, 2014 and December 31, 2015 (the "Audited Financials") and (b) the unaudited financial statements of Seller with respect to the operation of Hospital for the current year and as otherwise made available to Purchaser pursuant to <u>Section 4.5</u> (the "Interim Financials") (the collectively referred to herein as the "Financial Statements").  Except as set forth on **Schedule 2.9**, the Financial Statements fairly present, in all material respects, or will fairly present when prepared,  in all material respects, the financial position and results of operations, as applicable, of Seller with respect to the operation of the Hospital as of and for the periods then ended, in each case in conformity with generally accepted accounting principles consistently applied during such periods, except that the Financial Statements (i) do not reflect all cost report adjustments, allocations or adjustments of overhead, intercompany interest or income taxes, and other year-end adjustments, (ii) do not contain footnotes, (iii) were prepared without physical inventories, (iv) do not contain an unaudited statement of cash flow, (v) omit substantially all the disclosures required by generally accepted accounting principles, (vi) are not restated for subsequent events, (vii) may not reflect any adjustments for impairment of long-lived assets or goodwill, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) may not fully reflect the following liabilities: (A) vacation, holiday and similar accruals and accruals in respect of Seller's or any affiliate of Seller's self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), maintained by Seller or any affiliate of Seller on account of any of the Hospital's employees, the chief executive officer of the Hospital ("CEO"), the chief financial officer of the Hospital ("CFO"), and the chief nursing officer of the Hospital ("CNO"), (D) federal, state and local income or franchise taxes and (E) payroll and bonuses payable and vacation, holiday and similar accruals with respect to the CEO, CFO, and CNO.

1.5     <u>Legal Proceedings</u>.  Except as set forth on **Schedule 2.10**, there are no claims, proceedings or investigations filed or, to the knowledge of Seller, pending or threatened relating to or affecting Seller with respect to the operation of the Hospital or any of the Assets before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would have a material adverse effect on the Assets or the business condition of the Hospital.  Except as set forth on **Schedule 2.10**, Seller, with respect to the operation of the Hospital, is not subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to it or its assets, including the Assets,

which would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital. Seller, with respect to the operation of the Hospital, is not in default with respect to any final order, writ, injunction or decree served upon Seller from any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which default would have a material adverse effect on the Assets or the business condition (financial or otherwise) of the Hospital.

1.6     Employee Benefits.

(a)     **Schedule 2.11(a)** contains a list of (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Seller with respect to the operation of the Hospital, in which any employee of Seller participates in his capacity as such (collectively, the "Seller Plans").

(b)     Except as set forth on **Schedule 2.11(b)**, with respect to each Seller Plan, to Seller's knowledge, Seller does not have any direct or indirect, actual or contingent liability, other than to make payments for contributions, premiums or benefits when due in the ordinary course, all of which payments that are due having been made. Neither the Hospital nor any of the Assets are subject to any lien under ERISA or the Internal Revenue Code of 1986, as amended (the "Code").

(c)     All of the Seller Plans have been administered in material compliance with ERISA and the applicable provisions of the Code. There are no "accumulated funding deficiencies" within the meaning of ERISA or the Code or any federal excise tax or other liability on account of any deficient fundings in respect of the Seller Plans.

1.7     Personnel.

(a)     **Schedule 2.12(a)** sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates, bonus and other compensation and the paid time off pay of all full-time and part-time employees of Seller with respect to the operation of the Hospital and indicating whether such employee is a part-time or full-time employee.

(b)     Except as set forth on **Schedule 2.12(b)**, there are no labor unions representing or collective bargaining agreements in effect covering the employees of Seller with respect to the operation of the Hospital. There is no unfair labor practice complaint against Seller pending, or to the knowledge of Seller threatened, before the National Labor Relations Board with respect to the operation of the Hospital. To the knowledge of Seller, there is no labor strike, arbitration, dispute, slowdown or stoppage, and no union organizing campaign, pending or threatened, by or involving the employees of Seller that would materially affect the operation of

the Hospital.

(c)  **Schedule 2.12(c)** sets forth a complete list of the names and positions of all full-time employees of Seller with respect to the operation of the Hospital that have been terminated without cause during the ninety (90) days immediately preceding the Signing Date. Seller shall update Schedule 2.13(c) at Closing to reflect such terminations occurring during the ninety (90) days immediately preceding the Closing Date.

(d)  Except as set forth on **Schedule 2.12(d)**, neither Seller nor any affiliate of Seller is a party to an employment agreement with any Hospital Employee.

1.8  Insurance.  **Schedule 2.13** contains a list of all insurance policies maintained by Seller with respect to the operation of the Hospital as of the Signing Date.

1.9  Seller Knowledge.  References in this Agreement to "Seller's knowledge or "the best knowledge of Seller" means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of Seller, without independent investigation. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Seller as to the following matters as of the Signing Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

2.1  Authorization.  Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.

2.2  Binding Agreement.  All legal and other actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser; provided, however, that as of the Signing Date, Purchaser does not have a license or any of the necessary state or federal certificates, approvals or agreements to own and operate the Hospital or participate in any state or federal healthcare programs. Except as otherwise provided above, no other legal or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement and all transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and

other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

2.3  <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, is or will be duly authorized to transact business in the State of Ohio, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

2.4  <u>No Violation</u>.  Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

2.5  <u>Brokers and Finders</u>.  Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

2.6  <u>Representations of Seller</u>.  Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.12</u>), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Purchaser further acknowledges that Seller is not making any representations or warranties herein relating to the operation of the Hospital on and after the Effective Time.

2.7  <u>Legal Proceedings</u>.  Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

2.8  <u>No Knowledge of Seller's Breach</u>.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by Seller or of any other condition or circumstance that would excuse Purchaser from its timely performance of its obligations hereunder.  If information comes to Purchaser's attention on or before the Closing Date (whether

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 49 of 133

through Seller or otherwise and whether before or after the Signing Date) which indicates that Seller has breached any of its representations and warranties under this Agreement, then for the purposes of Seller's liability under such representations and warranties on and after the Effective Time the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Seller's representations and warranties in relation to such information; *provided, however,* that Purchaser must immediately notify Seller if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver by Purchaser of Seller's breach, if any, of any representation or warranty. If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) which would excuse Purchaser from its timely performance of its obligations hereunder, Purchaser must immediately notify Seller if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Seller shall constitute a waiver of such condition or circumstances insofar as it would excuse Purchaser from its timely performance of its obligations hereunder.

2.9    Ability to Perform. Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

2.10    Solvency. Purchaser is not insolvent and will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement. For purposes hereof, the term "insolvent" means that: (a) the fair salable value of Purchaser's tangible assets is less than the total amount of its liabilities (including for purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Purchaser is unable to pay its debts or obligations in the ordinary course as they mature; or (c) Purchaser does not have capital sufficient to carry on its businesses and all businesses which it is about to engage.

2.11    Payments. Purchaser acknowledges and agrees that the rates or bases used in calculating payments or reimbursements to it by any payor (including but not limited to Medicare/Medicaid) may differ from the rates and bases used in calculating such payments or reimbursements to Seller

2.12    Purchaser Knowledge. References in this Agreement to "Purchaser's knowledge or "the best knowledge of Purchaser" means the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without independent investigation. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 50 of 133

## ARTICLE 3

## COVENANTS OF SELLER

3.1    Access and Information; Inspections.

3.1.1    From the Signing Date through the Effective Time, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonably full and complete access during normal business hours to and the right to inspect the plants, properties, books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to businesses and properties of the Hospital as Purchaser or its representatives may from time to time reasonably request, without regard to where such information may be located; *provided, however,* that Seller is not obligated to disclose information which is proprietary to Seller and would not be essential to the ongoing operation of the Hospital by Purchaser; *provided, further,* that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Hospital. Such access may include consultations with the personnel of Seller; *provided, however,* that Purchaser shall not consult with or contact in any manner any employee at the Hospital without Seller's prior written consent (which consent may only be given by Lorri Wildi or a designee). Further, Purchaser may undertake environmental, mechanical and structural surveys of the Hospital. Notwithstanding the foregoing, all access and inspection activities contemplated by this Section 4.1 shall be subject to the prior reasonable approval of Seller (which approval may only be granted by Lorri Wildi or a designee) and all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller (including affiliates of Seller).

3.1.2    Notwithstanding anything contained herein, Seller shall not be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

3.2    Conduct of Business.    On and after the Signing Date and prior to the Effective Time, and except as otherwise consented to or approved by an authorized officer of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), required by this Agreement, or required by Seller's filing of the Petition or the Bankruptcy Code, Seller shall, with respect to the operation of the Hospital:

(a)    carry on its businesses with respect to the operation of the Hospital in substantially the same manner as presently conducted and not make any material adverse change

in operations, finance, accounting policies (unless Seller is required to adopt such changes under generally accepted accounting principles), or real or personal property;

        (b)     maintain the Hospital and all parts thereof and all other Assets in operating condition in a manner consistent with past practices, ordinary wear and tear excepted, inclusive of substitutions and retirements in the ordinary course of business;

        (c)     perform all of its material post-petition obligation in accordance with the Bankruptcy Code;

        **(d)**     in an effort to effectuate a smooth transition between Purchaser and Seller, Seller agrees to engage Purchaser for consulting services ("Consulting Services") from the time of execution of this Agreement until Closing to allow and aid in improving cost effectiveness and patient care quality metrics consistent with Seller's existing policies and protocols in accordance with the Consulting Agreement entered into between an affiliate of Purchaser and Seller.

        (e)     keep in full force and effect present insurance policies or other comparable self-insurance; and

        (f)     use its reasonable efforts to maintain and preserve its business organization intact, and maintain its relationships with physicians, suppliers, customers and others having a business relationship with the Hospital.

    3.3    <u>Negative Covenants</u>.  From the Signing Date until the Effective Time, with respect to the operation of the Hospital, Seller shall not, without the prior written consent of Purchaser or except as may be required by law (including the Bankruptcy Code) or Seller's filing of the Petition:

        (a)     except as provided in **<u>Schedule 4.3(a)</u>**, increase compensation payable or to become payable or make any bonus payment to or otherwise enter into one or more bonus agreements with any employee, except in the ordinary course of business consistent with past practice;

        (b)     create, assume or permit to exist any new funded indebtedness, mortgage, deed of trust, pledge or other material lien or encumbrance upon any of the Assets;

        (c)     acquire (whether by purchase or lease) or sell, assign, lease, or otherwise transfer or dispose of any property, plant or equipment, except in the ordinary course of business consistent with historical practices;

        (d)     except with respect to previously budgeted expenditures, purchase capital assets or incur costs in respect of material construction in progress;

        (e)     take any action outside the ordinary course of business that would have a material adverse effect on the Assets or the Hospital; or

(f)     materially reduce Inventory except in the ordinary course of business.

For purposes of this <u>Section 4.3</u>, Seller shall be deemed to have obtained Purchaser's prior written consent to undertake the actions otherwise prohibited by this <u>Section 4.3</u> if Seller gives Purchaser written notice of a proposed action and Seller does not receive from Purchaser a written notice of objection to such action within five (5) business days after Purchaser receives Seller's written notice. Notwithstanding any provision to the contrary contained in this Agreement, neither <u>Section 4.2</u> nor this <u>Section 4.3</u> shall be construed to prohibit Seller from engaging in any act which Seller reasonably believes is necessary to preserve and protect the condition or continued operations of the Hospital or to comply with contractual obligations or the requirements of governmental or regulatory authorities.  Seller shall give Purchaser prompt written notice subsequent to taking any act described in the immediately preceding sentence.

3.4     <u>Cooperation</u>.

3.4.1   Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date.  Except as may be otherwise requested by Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court Orders and authorizations, it shall be Purchaser's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain the Contract and Lease Consents, as well as all governmental consents, approvals, assignments, authorizations, clearances and licenses required to (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses and/or (y) transfer any of the Assets, including any Licenses. To the extent Purchaser needs certain information and data which is in the possession of Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from Seller in connection with the provision of such information.

3.4.2   Notwithstanding any provision to the contrary contained in this Agreement, Seller shall not be obligated to obtain the approval or consent to the assignment, to Purchaser, of any Assumed Contracts or Assumed Leases, from any party to any of the Assumed Contracts or Assumed Leases even if any such contract or lease states that it is not assignable without such party's consent.

3.5     <u>Additional Financial Information</u>.  Within thirty (30) calendar days following the end of each calendar month prior to Closing, Seller shall deliver to Purchaser complete copies of the unaudited balance sheet and related unaudited statements of income relating to Seller with respect to the operation of the Hospital for each month then ended, together with corresponding year-to-date amounts, which presentation shall be consistent with the provisions of <u>Section 2.9</u>

16-51552-amk     Doc 207     FILED 10/03/16     ENTERED 10/03/16 16:33:22     Page 53 of 133

which are applicable to the Financial Statements.

3.6    No-Shop.

(a)    Subject to Section 6.4, from and after the Signing Date until the earlier of the Closing Date or the termination of this Agreement, Seller shall not, without the prior written consent of Purchaser: (i) offer for sale or lease the assets of the Hospital or the Assets (or any material portion thereof); (ii) solicit offers to buy all or any material portion of any of the Hospital or the Assets; (iii) hold or continue to hold discussions with any party (other than Purchaser) looking toward such an offer or solicitation; or (iv) enter into any agreement with any party (other than Purchaser) with respect to the sale or other disposition of any of the Hospital or the Assets.

(b)    Purchaser expressly acknowledges and agrees that Seller has an obligation to seek out and determine the best and highest offer reasonably available for the Seller's assets in accordance with the Bankruptcy Code, as more fully outlined in ARTICLE 6, and nothing in Section 4.6(a) shall amend, modify, alter, diminish or affect such obligation.

(c)    Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

3.7    Seller's Efforts to Close. Subject to Section 4.6(b) and Section 6.4, Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or influence the satisfaction of such conditions; provided, however, that Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person (other than filing or application fees).

3.8    Title Matters. Purchaser has caused to be ordered (a) a preliminary binder or title commitment(s) (the "Title Commitment") sufficient for the issuance of an ALTA Extended Coverage Owner's Title Insurance Policy with respect to the Owned Real Property (the "Owner's Title Policy") and, if applicable, an ALTA Extended Coverage Leasehold Title Policy in a form approved for issuance in Ohio with respect to any ground lease specified on **Schedule 4.8** (the "Leasehold Title Policy") (the Owner's Title Policy and the Leasehold Title Policy are collectively referred to in this Agreement as the "Title Policy"), issued by First American Title Insurance Company – NCS Ontario (the "Title Company") provided that First American Title Insurance Company – NCS Ontario will utilize a local affiliate in the Coshocton, Ohio area as necessary to perform title services hereunder, together with true, correct and legible (or, if not legible, the best available) copies of all instruments referred to therein as conditions or exceptions to title (the "Title Instruments") which as of the signing date has not been received and (b) within ten (10) days of the Signing Date, Seller shall cause to be delivered to Purchaser

an ALTA survey or surveys of the Owned Real Property complying with the Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the Owned Real Property in a form reasonably acceptable to Purchaser (the "Surveys"). Section 13.12 shall govern which party or parties hereto shall bear the costs and expenses of the Title Commitment, the Title Policy and the Surveys. At the Closing, Seller shall deliver to the Title Company an owner's affidavit in substantially the form of **Exhibit 4.8** attached hereto (the "Seller's Affidavit"). SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY (HEREINAFTER DEFINED), PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED BY SELLER TO PURCHASER IN CONNECTION WITH THE TITLE COMMITMENT, THE TITLE INSTRUMENTS, THE TITLE POLICY, THE SURVEYS OR THE ENVIRONMENTAL SURVEY ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER.

     3.9    Termination of Hospital Employees. Subject to written notice from Purchaser as described in Section 5.3(e), Hospital Employees that become Hired Employees in accordance with Section 5.3 shall cease to be employees of Seller, and shall be removed from Seller's payroll. Seller shall timely make or cause to be made by Seller's affiliates appropriate distributions to, or for the benefit of, all of such Hired Employees in respect of the Seller Plans which are in force and effect with respect to such Hired Employees in accordance with ERISA, the Code, and the terms and conditions of the Seller Plans; *provided, however,* no such distribution shall be required to the extent it is among the Assumed Obligations.

     **3.10**    Termination Cost Reports. Purchaser shall file all Medicare, Ohio Medicaid, TRICARE, and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets to Purchaser and (b) the transactions contemplated by this Agreement. All such termination cost reports shall be filed by Purchaser in a manner that is consistent with current laws, rules and regulations. Seller shall be responsible for filing governmental cost reports for the period January 1, 2010 through the Closing Date. Purchaser shall be responsible for its own cost report filings relating to the Hospital beginning on the day immediately following the Closing Date.

## ARTICLE 4

## COVENANTS OF PURCHASER

     4.1    Purchaser's Efforts to Close. Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Seller's obligations under this Agreement to the extent that Purchaser's action or inaction can control or influence the satisfaction of such conditions.

     4.2    Required Governmental Approvals. Purchaser (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or

exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Seller or such authorities may reasonably request.  Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time.  Purchaser shall, no later than fifteen (15) business days after the Signing Date or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in Section 8.1. Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.  Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Lease of Real Property.  Purchaser's failure to obtain any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

    4.3    <u>Certain Employee Matters</u>.

       (a)    Purchaser covenants and agrees that it shall make offers of employment effective as of the Effective Time, in substantially equivalent positions and for the same consideration then in effect to substantially all of the persons who, immediately prior to the Effective Time, are employees of (i) Seller with respect to the operation of the Hospital or (ii) any affiliate of Seller which employs individuals at the Hospital (whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) (the "Hospital Employees").  Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees".   For the one year period following the Effective Time, Purchaser shall provide base salary and wages to all Hired Employees at the same level in effect immediately prior to the Effective Time.  In addition, Purchaser shall provide employee benefits (including, without limitation, health, dental, disability, life insurance and retirement plans), to each of the Hired Employees that are not less favorable than those to other similarly situated employees of Purchaser and its affiliates.

       (b)    Purchaser shall give all Hired Employees full credit for up to 300 hours paid time off pay to such employees as of the Closing Date, either by (i) crediting such employees the time off reflected in the employment records of Seller and/or any of its affiliates immediately prior to the Effective Time or (ii) by making full payments to such employees of the amounts which such employees would have received had they taken such paid time off up to 300 hours.

       (c)    Without limiting <u>Section 5.3(a)</u>, on and after the Effective Time, Hired Employees and their dependents shall be entitled to participate in any medical and hospital plan sponsored by Purchaser.  Hired Employees shall be given credit for periods of employment with Seller and Seller's affiliates, as applicable, prior to the Effective Time for purposes of

determining eligibility to participate and amount of benefits (including without limitation vesting of benefits), and preexisting condition limitations will be waived with respect to Hired Employees and their covered dependents. In addition, if prior to the Effective Time a Hired Employee or his or her covered dependents paid any amounts towards a deductible or out-of-pocket payments in Seller's or its affiliate's welfare benefit plan's current fiscal year, such amounts shall be applied toward satisfaction of the deductible or out-of-pocket maximum in the current fiscal year of Purchaser's welfare benefit plan that covers Hired Employees on and after the Effective Time. As of the Effective Time, Purchaser shall accept qualified direct rollover of accounts by Hired Employees from any qualified cash or deferred arrangement, such as a 403(b) plan.

(d)     Seller shall be responsible to provide continuation coverage pursuant to the requirements of Code section 4980B and Part 6 of Title I of ERISA ("COBRA Coverage") with respect to the Hospital Employees (and their dependents) whose qualifying event occurred prior to the date on which the Hospital Employees become Hired Employees. Purchaser shall be responsible to provide COBRA Coverage with respect to each of the Hospital Employees (and their dependents) whose qualifying event occurs on or after the date on which the Hospital Employees become Hired Employees.

(e)     After the Closing Date, Purchaser's human resources department will give reasonable assistance to Seller's and its affiliate's human resources departments with respect to Seller's and Seller's affiliates' post-Closing administration of Seller's and Seller's affiliates' pre-Closing employee benefit plans for the Hospital Employees (other than the Retained Management Employees). Within five (5) days after the Closing Date, Purchaser shall provide to Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

(f)     For a period of one (1) year following the Closing Date, Purchaser shall not engage in a "mass layoff" or "plant closing" as defined in the United States Worker Adjustment and Retraining Notification Act (the "WARN Act") without complying with the WARN Act. Purchaser shall defend, indemnify and hold harmless the Seller and its affiliates from any claims, charges, suits, demands, damage, or liability arising out of or relating either to non-compliance with the WARN Act from and after the Closing Date or from Purchaser's decision to terminate any Hospital Employee.

(g)     With respect to any collective bargaining agreements or labor contract with respect to any union employees, Purchaser shall comply with the applicable laws and bankruptcy court orders relating to collective bargaining agreements or labor contracts.

(h)     The provisions of this Section 5.3 are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

{6201998:}                                      33

4.4    <u>Excluded Assets</u>. As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Hospital on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage or holding of same on and after the Effective Time.

4.5    <u>Confidentiality</u>.

(a)    Purchaser shall, and shall cause its employees, representatives and agents to, hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of Purchaser's counsel, by other requirements of law, all Confidential Information (as hereinafter defined), and Purchaser shall not disclose the Confidential Information to any person, except as otherwise may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or diligence review by or on behalf of Purchaser. Purchaser's obligations set forth in the immediately preceding sentence shall apply (i) between the Signing Date and the Effective Time with respect to Confidential Information which is among the Assets and (ii) from and after the Signing Date for all Confidential Information which is not described in subsection (i) above. For the purposes hereof, "Confidential Information" shall mean all information of any kind concerning Seller, Seller's affiliates, or the business of the Hospital, in connection with the transactions contemplated by this Agreement except information (A) ascertainable or obtained from public or published information, (B) received from a third party not known by Purchaser to be under an obligation to Seller or any affiliate of Seller to keep such information confidential, (C) which is or becomes known to the public (other than through a breach of this Agreement), or (D) which was in Purchaser's possession prior to disclosure thereof to Purchaser in connection herewith.

(b)    If this Agreement is terminated, Purchaser shall (i) destroy all Confidential Information of Seller's prepared or generated by Purchaser without retaining a copy of any such material and will provide Seller with certification of such destruction executed by an officer or other appropriate official of Purchaser; and (ii) promptly deliver to Seller all other Confidential Information of Seller, together with all copies thereof, in the possession, custody or control of the Purchaser.

4.6    <u>Enforceability</u>. Purchaser hereby acknowledges that the restrictions contained in <u>Section 5.5</u> above are reasonable and necessary to protect the legitimate interests of Seller. The parties also hereby acknowledge and agree that any breach of <u>Section 5.5</u> would result in irreparable injury to Seller and that any remedy at law for any breach of <u>Section 5.5</u> would be inadequate. Notwithstanding any provision to the contrary contained in this Agreement, the parties therefore agree, and Purchaser hereby specifically consents that, without necessity of proof of actual damage, Seller may be granted temporary or permanent injunctive relief, that Seller shall be entitled to an equitable accounting of all earnings, profits and other benefits arising from such breach, and that Seller shall be entitled to recover their reasonable fees and expenses, including attorneys' fees, incurred by Seller in enforcing the restrictions contained in <u>Section 5.5</u>.

4.7    <u>Waiver of Bulk Sales Law Compliance</u>. Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in

any state in which the Assets are located and all other laws applicable to bulk sales and transfers.

4.8    Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then in effect.  During the period commencing on the Closing Date and ending on the two (2) year anniversary date of the Closing, Purchaser agrees that it will invest no less than One Million Dollars ($1,000,000.00) on physician recruitment, including primary and specialty care for the Hospital.

4.9    Local Governing Board.

(a)    Immediately after the Effective Time, Purchaser shall form a local governing board at the Hospital in accordance with the terms of this Section 5.9.  Such local governing board shall be an advisory committee to the board of directors of Purchaser comprised of medical staff members, community leaders and the Hospital's Chief Executive Officer.  The local governing board shall be subject to the authority of Purchaser's board of directors and the terms of Purchaser's Articles of Incorporation, Bylaws and other organizational documents.  The individuals on the local governing board should (i) represent the Hospital in the community and represent the views of the community to the local governing board in its deliberations, (ii) participate in Purchaser's community outreach programs and (iii) supervise the Hospital's charity care policies and practices.

(b)    The local governing board of the Hospital shall have responsibilities that are consistent with similar local governing boards at other hospitals, or in other markets, respectively, which are owned directly or indirectly by affiliates of Purchaser.  For a period of three (3) years after the Closing Date, the current board of trustees of Seller, on the one hand, and Purchaser, on the other hand shall cooperate with each other in the selection of the Local Governing Board.

4.10    Capital Expenditures.  During the period commencing on the Closing Date and ending on the five (5) year anniversary date of the Closing, Purchaser agrees that it will invest no less than Twenty Five Million Dollars ($25,000,000.00) for capital improvements, equipment, information technology, infrastructure improvements, and/or working capital at the Hospital.

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 59 of 133

4.11  Maintenance of Services.  For no less than five (5) years after the Closing Date, Purchaser shall operate the Hospital as a full service, licensed acute care hospital with an open and accessible emergency department and those other services set forth on **Schedule 5.11**, to the extent physician coverage is reasonably available.

4.12  Attorney General Conditions.  Purchaser understands that the Ohio Attorney General is likely to impose certain conditions on Purchaser's acquisition and operation of the Hospital.  Purchaser agrees to accept such conditions provided that as determined in Purchaser's reasonable discretion the terms and conditions do not impose adverse effects upon Purchaser or the Hospital.

4.13  Conduct Pending Closing.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, unless Seller shall otherwise consent in writing, Purchaser shall not take any action or fail or omit to take any action which would cause any of Purchaser's representations and warranties set forth in ARTICLE 4 to be inaccurate or untrue as of the Closing.

4.14  Purchaser's Insurance.  At least ten (10) days prior to the Closing Date, Purchaser will deliver to Seller a schedule that lists Purchaser's policies and contracts that will be in effect as of such date for casualty and property insurance covering its assets and properties as existing on and after the Closing and the conduct of its business as such business will be conducted after the Closing, together with a description of the risks insured against, coverage limits, deductible amounts, and carriers, such insurance policies and coverage terms to be reasonably acceptable to Seller.

4.15  Resale Certificate.  Purchaser agrees to furnish to Seller any resale certificate or certificates or other similar documents reasonably requested by Seller to comply with or obtain an exemption from pertinent excise, sales and use tax laws.

4.16  Cure Costs.  Purchaser shall, at or prior to the Closing, pay the Cure Costs for each Assumed Contract and Assumed Lease so that each such Assumed Contract and Assumed Lease may be assumed by Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.  For purposes of this Agreement, "Cure Costs", means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Assumed Contracts and Assumed Leases to Purchaser as provided herein.

4.17  Reporting.  Purchaser shall provide to Seller or its designee, at Purchaser's sole cost and expense, a report, at least annually, certifying its compliance with the covenants of Purchaser set forth in Sections 5.8, 5.10, and 5.11 for the periods when such Sections remain applicable and any material matters relating to each of such covenants.

4.18    Adequate Assurances Regarding Assigned Contracts and Required Orders.  With respect to each Assumed Contract and Assumed Lease, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract and Assumed Lease by Purchaser.  Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser and its affiliates and related persons available to testify before the Bankruptcy Court.

4.19    Affiliate Healthcare Claims.  Other than the Employee Portion (defined below), Purchaser forever releases, waives and discharges, and shall be forever precluded from asserting, any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities then existing in law, equity or otherwise, that Purchaser, to the fullest extent legally possible, has, had or may have against Seller and its respective present or former managers, directors, officers, employees, management, predecessors, successors, and owners acting in such capacity, that are based in whole or in part on any amounts due and owing to Seller in connection with the provision of services to Seller's employees and contractors and their dependents under any Seller welfare benefit plan, including without limitation any self-insured plan.  "Employee Portion" means the amount due and owing by employee as primary obligor (but not as secondary obligor) under the applicable terms of the Seller's welfare benefit plans.  For example purposes only, if Employee A has an insurable claim for which the employer is responsible for $400 and the employee is responsible for $100, Purchaser releases all claims in connection with the $400 against both the employer and the employee.

## ARTICLE 5

## SELLER'S BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

5.1    Bankruptcy Court Approval.

(a)    Seller and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval.

(b)    Seller shall on or about June 30, 2016 file a motion pursuant to Bankruptcy Code Section 363 seeking approval of this Agreement ("Sale Motion") and shall exercise good faith and use reasonable efforts to obtain a "Sale Order" approving this Agreement and designating Purchaser the "stalking horse".  For purposes of this Agreement, the term "Sale Order" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form satisfactory to Purchaser.

(c)    Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)  Subject to Section 6.4, from and after the Signing Date and prior to the Closing or the termination of this Agreement, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of this Agreement.

(e)  Seller shall provide for the publication in reputable newspaper for at least one week of notice of the sale and the filing of claims in the Seller's bankruptcy proceedings.

(f)  Seller shall obtain an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against Seller as debtor solely in the Bankruptcy Court.

5.2  Bankruptcy Filings

(a)  From and after the Signing Date and until the Closing Date, Seller shall provide notice, within 3 business days, to Purchaser of the filing of any pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Bankruptcy Case.  Notwithstanding the foregoing, but except as required by applicable law or fiduciary duty or as necessary or desirable to preserve Seller's rights hereunder, Seller shall not file any pleadings, motions, notices, statements, schedules, applications, reports and other papers in the Bankruptcy Case that would, or would reasonably be expected to, alter, modify, limit or restrict Purchaser's rights or remedies pursuant to this Agreement, without the prior written consent of Purchaser (which may be granted or withheld in Purchaser's sole discretion).

5.3  DIP Financing.  Upon Seller obtaining approval for Debtor in Possession financing ("Dip Financing"), either or both of PHS shall provide a loan ("DIP Loan") upon the terms and conditions of the loan documents set forth in **Schedule 6.3** hereof.

5.4  Bidding Procedures.  Seller reserves the right to obtain a higher bid for the Assets pursuant to bidding procedures to be utilized by the Seller in its discretion and in the exercise of its business judgment.  Seller has represented to Purchaser that any overbids must: (a) be in a minimum amount of $10,500,000 plus Cure Costs plus fees payable under the Consulting Agreement in accordance with Section 1.2 hereof and accompanied by a deposit in the form of cash or a cashier's check in the amount of $1,050,000; (b) provide evidence satisfactory to the Seller of having sufficient specifically committed funds to complete the transaction or a non-contingent lending commitment for the full bid amount and such other documentation relevant to the bidder's ability to qualify as the purchaser of the Assets and ability to close the sale and immediately and unconditionally pay the purchase price at closing; (c) provide admissible evidence of its ability to provide adequate assurance of future performance under the Assigned Leases and Assigned Contracts; and (d) seek to acquire the Assets on terms and conditions not less favorable to the Seller than the terms and conditions to which the Purchaser has agreed, including but not limited to completing any due diligence by the same deadline as imposed on Purchaser and closing on the sale in the same time parameters as Purchaser.

5.5  Break-Up Fee.  In the event that an overbidder (and not Purchaser) is the successful bidder for the purchase of the Assets, the Seller shall request authorization of the

Bankruptcy Court to pay the Purchaser's fees and expense associated with the sale of the Assets in an amount of the Purchaser's fees and expenses, agreed by the parties to be $350,000 ("Break-Up Fee") and the reimbursement ("Break-Up Expense Reimbursement") of the actual out-of-pocket expenses incurred by Purchaser in the performance Purchaser's due diligence investigation, review, research and analysis regarding the Sale Assets, the Assumed Liabilities and the Sale, the negotiation and documentation of this Agreement, Consulting Services as set forth in Section 4.2 Conduct of Business, subsection (d) and the arranging of financing with which to purchase the Sale Assets, in a total amount of not more than $150,000. The Break-Up Fee and Break-Up Expense Reimbursement will be subject to Bankruptcy Court approval and shall constitute a super-priority administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind other than the Carve-Out (as defined in the DIP Loan Agreement), including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code. Purchaser shall be allowed to credit bid the Break-Up Fee in any overbids that Purchaser may elect to make with respect the Assets.

      5.6    Appeal of Sale Order. In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

## ARTICLE 6

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

      Seller's obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Seller in whole or in part at or prior to the Closing:

      6.1    Signing and Delivery of Instruments. Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

      6.2    No Restraints. No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

      6.3    Performance of Covenants. Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to

be performed or complied with by it on or prior to the Closing Date.

6.4 <u>Governmental Authorizations</u>. Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

6.5 <u>Attorney General Approval</u>. The Ohio Attorney General shall have approved the transactions contemplated by this Agreement, in accordance with <u>Section 5.12</u> hereof.

6.6 <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Sale Order.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

7.1 <u>Governmental Authorizations</u>. Purchaser shall have obtained, approvals licenses, permits and authorizations set forth in **Schedule 8.1** (collectively, the "Government Authorizations"), except in such case where failure to obtain such Government Authorization does not have a material adverse effect.

7.2 <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under § 363 of the Bankruptcy Code.

7.3 <u>Signing and Delivery of Instruments</u>. Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

7.4 <u>Performance of Covenants</u>. Seller shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller on or prior to the Closing Date; *provided, however,* this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would more likely than not result in a material adverse effect on the Assets or the business of the Hospital.

7.5    <u>No Restraints</u>.   No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.6    <u>Title Insurance Policy</u>.  The Title Company has irrevocably committed to issue the Title Policy to Purchaser covering the Owned Real Property and any ground lease specified on **Schedule 4.8** in the amount of the full insurable value of the Owned Real Property and any such ground lease, respectively (which amount shall be set forth in **Schedule 8.6**).  Such Title Policy shall show fee simple title to the Owned Real Property vested in Purchaser, and valid leasehold title to the Leased Real Property which is subject to any ground lease specified on **Schedule 4.8**, subject only to: (a) restrictions imposed on any License necessary or appropriate to conduct the Business as currently conducted, (b) statutory liens of landlords and liens of carriers, warehousemen, mechanics, materialmen and other liens imposed by law incurred in the ordinary course of business, (c) liens for taxes, assessments or other governmental charges or claims not yet due and payable as of the Closing Date or which are being contested in good faith, (d) liens incurred or deposits made in the Ordinary Course of Business in connection with obligations not due or delinquent with respect to workers' compensation insurance, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, performance and return of money bonds and other similar obligations, (e) recorded easements, covenants, rights-of-way and other similar restrictions that, individually or in the aggregate, do not materially impair the continued use and operation of the assets to which they relate in the conduct of the Business as currently conducted, (f) any conditions that would be disclosed by a current, accurate survey or physical inspection made prior to the Closing that, individually or in the aggregate, do not materially impair the continued use and operation of the assets to which they relate in the conduct of the Business as currently conducted, and (g) zoning, building and other similar restrictions that, individually or in the aggregate, do not materially impair the continued use and operation of the assets to which they relate in the conduct of the Business as currently conducted (collectively, "Permitted Exceptions").

7.7    <u>Attorney General Approval</u>.  The Ohio Attorney General shall have approved the transactions contemplated by this Agreement in accordance with <u>Section 5.12</u> hereof.

# ARTICLE 8

## TERMINATION

8.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to Closing:

     (a)     by the mutual written consent of the parties;

     (b)     by Seller if a material breach of this Agreement has been committed by

{6201998:}

41

Purchaser and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within fifteen (15) business days after service by Seller upon Purchaser of a written notice which describes the nature of such breach; *provided, however,* Seller shall not be permitted to terminate this Agreement pursuant to this Section 9.1(b) if such material breach was caused by Seller or if Seller is also in material breach of this Agreement;

        (c)     by Purchaser if a material breach of this Agreement has been committed by Seller and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Seller of a written notice which describes the nature of such breach; *provided, however,* Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 9.1(c) if such material breach was caused by Purchaser or if Purchaser is also in material breach of this Agreement;

        (d)     by Purchaser if any of the conditions in ARTICLE 8 have not been satisfied as of November 30, 2016, or if satisfaction of any condition in ARTICLE 8 is or becomes impossible and Purchaser has not waived such condition in writing on or before on or before November 30, 2016, (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Seller's failure to provide its closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date);

        (e)     by Seller if any of the conditions in ARTICLE 7 have not been satisfied as of November 30, 2016, or if satisfaction of any such condition in ARTICLE 7 is or becomes impossible and Seller has not waived such condition in writing on or before November 30, 2016 (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Seller to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Seller not being ready, willing and able to close the transaction on the Closing Date);

        (f)     by either Purchaser or Seller if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or fails to approve the sale of the Assets to Purchaser;

        (g)     by Purchaser or Seller, upon the delivery of a Casualty Termination Notice in accordance with Section 1.13; or

        (h)     by either Purchaser or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2016 (the "Termination Date").

        8.2    Termination Consequences.  If this Agreement is terminated pursuant to this Section 9.1: (a) all further obligations of the parties under this Agreement shall terminate, except that the obligations in Sections 5.5, 5.6, 13.3, 13.8, 13.12, and 13.17 shall survive, and (b) each party shall pay the costs and expenses incurred by it in connection with this Agreement, except as provided in Section 13.12; provided, however, in the case of a termination under Section

9.2(f) solely because an overbidder is the successful bidder under <u>Section 6.5</u>, then Seller shall pay to Purchaser the Break-Up Fee and Break-Up Expense Reimbursement. Each Party acknowledges that the agreements contained in this <u>Section 9.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that the Break-Up Fee and Break-Up Expense Reimbursement does not constitute a penalty, and constitutes liquidated damages and the receipt of the payment of the Break-Up Fee and Break-Up Expense Reimbursement shall constitute the sole remedy for Purchaser arising out of such termination, including the matters, circumstances or reasons giving rise to the right of Purchaser to terminate.

## ARTICLE 9

## POST-CLOSING MATTERS

9.1    <u>Excluded Assets and Excluded Liabilities.</u>

Subject to <u>Section 10.2</u> hereof, any asset or any liability, any payments, and any and all other remittances and any and all mail and other communications that is an Excluded Asset or an Excluded Liability (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by a court or similar tribunal, and which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller at Seller's cost except in cases where Purchaser has expressly agreed to incur such costs pursuant to this Agreement. Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to Seller under this <u>Section 10.1</u> against, nor the right to contest its obligation to transfer, assign and convey to Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against Seller. If Purchaser does not remit any monies included in the Excluded Assets to Seller in accordance with the first sentence of this <u>Section 10.1</u>, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "Excluded Asset Due Date") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to Seller.

9.2    <u>Preservation and Access to Records After the Closing.</u>

(a)    From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "Document Retention Period"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets. Purchaser will afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the

Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by Seller or Seller's affiliates for any lawful purpose. Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality. Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires. Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of relevant insurance carriers. After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this Section 10.2(a), Purchaser shall provide written notice to Seller of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal. Seller shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period. If Seller does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)     Purchaser shall give full cooperation to Seller, Seller's affiliates and their insurance carriers in respect of the defense of claims by third parties against Seller or any affiliate of Seller, in respect of events occurring prior to the Effective Time with respect to the operation of the Hospital. Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials. Such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees). In addition, Seller and Seller's affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Seller or any of Seller's affiliates in connection with such litigation. Any records so removed from the Hospital shall be promptly returned to Purchaser following Seller's or its applicable affiliate's use of such records.

(c)     In connection with (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Seller's rights to the Excluded Assets, (iii) in connection with any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) the Seller's obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Seller access during normal business hours to Purchaser's books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Seller and Seller's affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital. Seller acknowledges that it shall coordinate its activities contemplated by this Section 10.2(c) through Seller's general counsel.

(d)     Purchaser and its representatives shall be given access by Seller during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Seller pertaining to any of the Assets or with respect to the operation of the Hospital prior to the Effective Time, all in such manner as to not interfere unreasonably with Seller's business. Such

documents and other materials shall be, at Seller's option, either (i) copied by Seller for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Seller.

(e)     Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(f)     Purchaser shall cooperate with Seller, on a timely basis and as reasonably requested by Seller, in connection with the provision of all data of the Hospital and other information required by Seller for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

(h)     <u>Provision of Benefits of Certain Contracts</u>.  Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract or Assumed Lease, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Seller or Purchaser, as the assignee of such Assumed Contract or Assumed Lease, as the case may be, thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Seller will cooperate with Purchaser in any reasonable arrangement designed to both (a) provide Purchaser with the benefits of or under any such Assumed Contract or Assumed Lease, and (b) cause Purchaser to bear all costs and obligations of or under any such Assumed Contract or Assumed Lease.  Further, notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Account Receivable the assignment of which is either prohibited by law or by the terms of any contract with a payor without the consent of such payor.  Any payments received by Seller after the Closing Date from patients, payors, clients, customers, or others who are the obligors on Accounts Receivables transferred to Purchaser as a part of the  on the Closing Date shall be paid over to Purchaser within ten (10) business days after receipt by Seller.

9.3     <u>Closing of Financials</u>.  Purchaser shall cause the individual acting as the chief financial officer of the Hospital after the Effective Time (the "Post-Effective Time CFO") to complete the standardized closing of Seller's financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "Closing of Financials").  Purchaser shall cause the Post-Effective Time CFO to use his or her good faith efforts to complete the Closing of Financials by no later than the date which is thirty (30) calendar days after the Closing Date.  Seller shall hold Purchaser harmless for any

errors which are made by the Post-Effective Time CFO during the course of the Closing of Financials, provided that such errors are not the result of gross negligence, fraud or intentional misconduct. The Post-Effective Time CFO and other appropriate personnel shall be reasonably available to Seller for a period of no less than one hundred eighty (180) calendar days after the Closing Date to assist Seller in the completion of Seller's post-Closing audit, such assistance not to interfere unreasonably with such Post-Effective Time CFO's other duties.

9.4 <u>Physician Privileges</u>. Purchaser hereby covenants and agrees to continue to accord from and after the Closing all privileges to practice medicine pursuant to the Business to each physician who, immediately prior to the Closing, is (a) on the medical staff, or (b) a tenant of any of the medical office buildings; *provided*, that such physicians continue to meet the qualifications and guidelines which may be established from time to time by Purchaser which apply to the granting of physician privileges generally at the facilities, and provided further that Purchaser may limit the total number of physicians accorded privileges based on the needs pursuant to the Business. Purchaser covenants and agrees that (i) it shall not at any time require that ownership of an equity or other interest in Purchaser or any of Purchaser's affiliates or any of their respective constituent entities shall be a requirement or shall entitle a person to any right or preference to be accorded privileges or benefits to practice medicine at either of the facilities, and (ii) it shall not cause, permit, or allow any person to be accorded privileges or benefits to practice medicine pursuant to the Business solely on the basis of ownership of an equity or other interest in Purchaser or any of Purchaser's affiliates or any of their respective constituent entities, without such person otherwise satisfying the professional and character qualifications and guidelines which apply generally to physicians practicing at the Seller's facilities.

## ARTICLE 10

## SURVIVAL

Except as expressly set forth in this Agreement to the contrary, all representations and warranties of Purchaser and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall continue to be fully effective and enforceable through the Effective Time and shall thereafter be of no further force and effect. The covenants and agreements contained herein that by their terms are to be performed after Closing (or that are expressly intended to survive Closing as set forth herein) shall survive the Closing for such terms.

## ARTICLE 11

## TAX AND COST REPORT MATTERS

11.1 <u>Tax Matters; Allocation of Purchase Price</u>.

(a) After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all

such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof. The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of its post-Closing audits of the Hospital.

(b)     Within 30 days after the Signing Date, Purchaser shall deliver to Seller for Seller's review a schedule setting forth the allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income Tax purposes) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such schedule, as may be amended as contemplated below in this Section 12.1(b), the "Allocation Schedule"). The Allocation Schedule shall be deemed final and binding upon the parties upon Seller's approval thereof (which shall not be unreasonably conditioned or delayed). The parties shall cooperate in good faith to finalize the Allocation Schedule within 10 days after delivery of the initial draft of the schedule by Purchaser to Seller. If within such 10 day period (or such other period as the parties may agree), the parties are unable to reach agreement on a final Allocation Schedule, the parties shall have no further obligations under this Section 12.1(b). If the parties are able to agree on an Allocation Schedule, the parties shall refrain from taking any position that is inconsistent with the Allocation Schedule.

11.2     Cost Report Matters.

(a)     Consistent with Section 4.10, Seller shall prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Ohio Medicaid, and other third party payors which settle on a cost report basis (the "Seller Cost Reports").

(b)     Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Seller in regard to Seller's preparation, filing, handling, and appeals of the Seller Cost Reports. Upon reasonable notice and during normal business office hours, Purchaser will cooperate with Seller in connection with any cost report disputes and/or other claim adjudication matters relative to governmental program reimbursement. Such cooperation shall include, at no cost to Seller, obtaining access to files at the Hospital and Purchaser's provision to Seller of data and statistics, and the coordination with Seller pursuant to reasonable notice of Medicare and Ohio Medicaid exit conferences or meetings.

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1     Further Assurances and Cooperation.     Seller shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall

take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    Successors and Assigns. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties, except that Purchaser may assign any of its rights or delegate any of its duties under this Agreement to any wholly-owned subsidiary of Purchaser.

12.3    Governing Law; Venue. This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Ohio (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.4    Amendments. This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    Exhibits, Schedules and Disclosure Schedule. The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein. From the Signing Date until the Closing, the parties agree that Seller may update the Disclosure Schedule as necessary upon written notice to Purchaser, which update shall be acceptable to Purchaser in its reasonable discretion; such update shall be deemed accepted if Purchaser does not provide notice to the contrary within 5 days of receipt of such update from Seller. Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Seller and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Seller and Purchaser in their reasonable discretion prior to being attached hereto. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The inclusion of any information in the Schedules shall not be deemed an admission or acknowledgement, in and of itself and solely by virtue of the inclusion of such information in the Schedules, that such information is required to be listed in the Schedules or that such items are material to the Company, Seller or Purchaser, as the case may be. The headings, if any, of the individual sections of each of the Schedules are provided for convenience only and are not intended to affect the construction or interpretation of this

Agreement. The Schedules are arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article III merely for convenience, and the disclosure of an item in one section of the Schedules as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such disclosure, notwithstanding the presence or absence of an appropriate section of the Schedules with respect to such other representations or warranties or an appropriate cross reference thereto.

12.6    Notices. Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Seller: | Coshocton County Memorial Hospital<br>1460 Orange Street<br>Coshocton, Ohio 43812<br>Attention:　Lorri Wildi |
| With a copies to:<br>(which copies shall<br>not constitute notice) | McDonald Hopkins LLC<br>600 Superior Ave # 2100<br>Cleveland, OH 44114<br>Attention: Sean Malloy, Esq.<br>Phone: 216.348.5436 |
| If to Purchaser: | Prime Healthcare Foundation, Inc.<br>Prime Healthcare Foundation-Coshocton, LLC<br>3300 R. Guasti Road, 2nd Floor<br>Ontario, California 91761<br>Attention: Troy Schell<br>Facsimile No.: (909) 235-4419 |
| With a copy to:<br>(which copies shall | Shulman Hodges & Bastian LLP<br>26632 Towne Centre Drive, Suite 300<br>Foothill Ranch, California 92610<br>Attention: Leonard M. Shulman, Esq.<br>Facsimile No.: (949) 340-3000 |

or at such other address as one party may designate by notice hereunder to the other parties.

12.7    Headings. The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 73 of 133

schedules hereto.

12.8    Confidentiality and Publicity.

(a)    The parties hereto shall hold in confidence the information contained in this Agreement, and all information related to this Agreement, which is not otherwise known to the public, shall be held by each party hereto as confidential and proprietary information and shall not be disclosed without the prior written consent of the other parties; *provided, however,* (i) Seller shall be permitted to provide a copy of this Agreement to any applicable governmental or administrative authorities in connection with Seller's pursuit of any appeal of any real and personal property tax assessments on the Assets for periods prior to the Effective Time, and (ii) Purchaser shall be permitted to provide a copy of this Agreement to any applicable governmental and/or regulatory authority as part of the licensing process so long as it is a requirement of such authority that this Agreement be provided in connection with the licensing process and Purchaser provides prior written notice thereof to Seller prior to making such disclosure and (iii) Seller shall be permitted to provide a copy of this Agreement to Health Care Property Investors, Inc. (or its applicable affiliate). Accordingly, Purchaser and Seller shall not discuss with, or provide nonpublic information to, any third party (except for such party's attorneys, accountants, directors, officers and employees, the directors, officers and employees of any affiliate of any party hereto, and other consultants and professional advisors) concerning this transaction prior to the Effective Time, except: (a) as required in governmental filings or judicial, administrative or arbitration proceedings, including without limitation the filings to be made by the parties with respect to filings required to be made in connection with the securities laws or the rules and regulations of the U.S. Securities and Exchange Commission; or (b) pursuant to public announcements made with the prior written approval of Seller and Purchaser in accordance with Section 13.8(b). The rights of Seller under this Section 13.8 shall be in addition and not in substitution for the rights of Seller and Seller's affiliates under Section 5.6 of this Agreement and any preexisting confidentiality agreement, which shall survive Closing.

(b)    Prior to the Closing Date, Seller and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or any other transaction contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; *provided, however,* that nothing in this Section 13.8(b) shall be deemed to prohibit either Seller or Purchaser from making any disclosure that its counsel deems necessary or advisable in order to satisfy either party's disclosure obligations imposed by law subject to reasonable prior notice to the other party thereof.

12.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10    Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."

12.11 <u>Third Party Beneficiary</u>. None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

12.12 <u>Expenses and Attorneys' Fees</u>. Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated. The parties expressly agree that (a) all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser; and (b) the following shall be borne one-half by Purchaser and one-half by Seller: (i) all costs of the Title Commitment and the Title Policy (including the cost of any endorsements thereto); (ii) all recording fees or similar charges in connection with the sale of the Assets; (iii) all costs of the Environmental Survey; and (iv) all costs of the Surveys. If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14 <u>Entire Agreement</u>. This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect.

12.15 <u>No Waiver</u>. Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition. The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance. The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16 <u>Severability</u>. If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable

{6201998:}

51

to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17  _Liabilities._  All liabilities and obligations of PHS and Prime-Coshocton shall be joint and several.

12.18  _Time is of the Essence_.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[REMAINDER OF PAGE IS BLANK]*

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

**Prime Healthcare Foundation, Inc., a
Delaware corporation**

By: _____
Name: _____
Title: _____

**Prime Healthcare Foundation- Coshocton,
LLC, a Delaware limited liability company**

By: _____
Name: _____
Title: _____

**SELLER:**
**Coshocton County Memorial Hospital**

By: _____
Name: _____
Its: _____

*Signature Page to Asset Sale Agreement*

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

PURCHASER:

Prime Healthcare Foundation, Inc., a
Delaware corporation

By: _____
Name: _____
Title: _____

Prime Healthcare Foundation- Coshocton,
LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

SELLER:
Coshocton County Memorial Hospital

By: *Lorri S. Wildi*
Name: *Lorri S. Wildi*
Its: *CEO*

*Signature Page to Asset Sale Agreement*

## Disclosure Schedules to Asset Sale Agreement

These Disclosure Schedules have been prepared and delivered by Coshocton County Memorial Hospital Association, an Ohio nonprofit corporation ("Seller"), to Prime Healthcare Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under § 501(c)(3) of the Code, and Prime Healthcare Foundation-Coshocton, LLC, a Delaware limited liability company (together, "Purchaser"), in accordance with the Asset Sale Agreement, dated June 30, 2016 (the "Agreement"), by and among Seller and Purchaser. Capitalized terms used, but not otherwise defined herein shall have the meanings set forth in the Agreement. Section references in these Disclosure Schedules correspond to sections of the Agreement. Headings contained in these Disclosure Schedules shall not be deemed to modify, limit or influence the interpretation of the information contained herein or in the Agreement. Any information disclosed on one section of these Disclosure Schedules shall be deemed to be disclosed on such other sections of these Disclosure Schedules to the extent that such disclosure is reasonably apparent from its face to be applicable to such other section of these Disclosure Schedules. Any description of any contract or other written document on any section of these Disclosure Schedules hereto is a summary only and is qualified in its entirety by the terms of the underlying Contract or other written document to which such description refers. No disclosure in any Disclosure Schedule relating to any possible breach or violation of any contract, permit or law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred, or shall constitute an admission of liability to any third party. These Disclosure Schedules may include items and information that are not "material" relative to the Seller, taken as a whole, and such inclusion shall not be deemed to be an acknowledgment or agreement that any such item or information is "material" or to further define the meaning of such term for purposes of the Agreement or otherwise. Information contained in these Disclosure Schedules is not necessarily required by the Agreement to be reflected in these Disclosure Schedules.

{6202013:}

## Schedule A

## Clinic Locations

- Coshocton Hospital Pleasant Valley Clinic
- Coshocton Hospital Dresden Clinic
- Coshocton Hospital Family Physicians Clinic
- Coshocton Hospital Arrowhead Clinic
- Coshocton Hospital Orthopaedic Clinic
- Coshocton Women's Health Center
- Coshocton Hospital Outpatient Oncology
- Coshocton Surgical Center
- Coshocton Heart & Vascular Center
- Coshocton Hospital Occupational Medicine Clinic
- Coshocton County Memorial Hospital Pain Management Center, LLC (Joint Venture with Pain Management Group, LLC)
- Coshocton ENT Center

{6202013:}

# Schedule 1.7(a)

## Owned Real Property

| Address |
|---|
| 311 15th Street<br>Coshocton, Ohio 43812 |
| 1512 Walnut Street<br>Coshocton, Ohio 43812 |
| 6307 State Street East<br>Newcomerstown, Ohio 43812 |
| 1433 Walnut Street<br>Coshocton, Ohio 43812 |
| 1381 Walnut Street<br>Coshocton, Ohio 43812 |
| 410 South 15th Street<br>Coshocton, Ohio 43812 |
| 1460 Orange Street<br>Coshocton, Ohio 43812 |
| 1523 Walnut Street<br>Coshocton, Ohio 43812 |
| 406 South 15th Street<br>Coshocton, Ohio 43812 |
| 1413 Orange Street<br>Coshocton, Ohio 43812 |
| 1390 Pleasant Valley Drive<br>Coshocton, Ohio 43812 |
| 1410 Walnut Street<br>Coshocton, Ohio 43812 |
| 221 Railroad Street<br>Warsaw, Ohio 43844 |
| 600 East Main Street<br>West Lafayette, Ohio 43845 |
| 1501 Orange Street<br>Coshocton, Ohio 43812 |

**Schedule 1.7(b)**

**Personal Property**

See Seller's 2015 Fixed Asset Register, attached as **<u>Appendix 1.7(b)</u>**.[1]

---

[1] Due to their voluminous nature, this appendix and any other appendix referenced in these Disclosure Schedules are not attached hereto. Each appendix is available upon request to Debtor's counsel.

{6202013:}

## Schedule 1.7(c)

### Licenses

**Licenses, Accreditations, Certificates:**[2]

| Document | Inspection or Certification Date | Certification Validity/Expiration Date |
|---|---|---|
| Joint Commission Laboratory Accreditation Program | August 19, 2014 | 24 months |
| Joint Commission Hospital Accreditation | August 7, 2015 | 36 months |
| Mammography Certification | August 25, 2015 | 12 months |
| Radiology Inspection (Ohio Department of Health) | November 16, 2015 | 24 months |
| Ohio Department of Health Bed Inspection/Registration | April 13, 2016 | Yearly |
| Radiology Registration (certificate of registration) | May 2015 | May 31, 2018 |
| Cardiology & Pulmonary Rehab Certification | August 31, 2015 | 26 months |
| Pharmacy License | ID No. HOS.020037100-03; March 2016 | March 31, 2017 |
| DEA License | DEA No. AC2840026 | 08/31/18 |
| Family Physicians CLIA | 36D0333109; July 2015 | 07/14/2017 |
| Dresden CLIA | 36D1046737; October 2015 | 10/17/2017 |
| Women's Center CLIA | 36D0978445; September 2014 | 09/24/2016 |
| Pain Occupational Medicine CLIA | 36D0946776; June 2016 | 06/01/2018 |
| Hospital Lab Dr. Little CLIA (owned by Genesis HealthCare System) | 36D0333104; November 2015 | 11/30/2017 |
| Hospital Lab Dr. Virostko CLIA (Blood Gas Lab) | 36D0667882; November 2015 | 11/30/2017 |
| Pleasant Valley Clinic CLIA | 36D1089542; September 2014 | 09/18/2016 |
| ACR Accreditation (Mammography) | July 3, 2013 | October 28, 2016 (36 months) |
| Vascular Accreditation | July 2013 | November 30. 2016 (36 months) |
| MQSA Facility Inspection / Breast Health Center | August 25, 2015 | 12 months |
| Nuclear Medicine (ODH) | April 20, 2015 | 60 months |
| License for Radioactive Material | July 2015 | July 1, 2021 |

---

[2] Seller makes no representation or warranty as to the assignability or transferability of any of the Licenses.

| Document | Inspection or Certification Date | Certification Validity/Expiration Date |
|---|---|---|
| Tuscarawas County General Health District – Arrowhead Clinic | January 16, 2015 | January 2017 |
| Coshocton County Fire Department | February 26, 2016 | February 2017 |
| Coshocton Industrial User Pretreatment Inspection | July 1, 2016 (effective date) (inspection in June 2016) | July 1, 2021 |
| Ohio Board of Pharmacy Terminal Distributor of Dangerous Drugs License (contact Stephanie Conn for more information) | License #020037100 | Yearly |
| National Council for Prescription Drug Programs Identification Number | License # 367715 | N/A |

## Provider Numbers

| Provider | NPI | Medicare | Medicaid |
|---|---|---|---|
| Coshocton County Memorial Hospital | 1053398099 | 360109/3601091 | 1793340 |
| Beed, Elaine | 1326143777 | H257540 | 0600666 |
| Bryan, Lindsey | 1194118240 | H281220 | 0122348 |
| Corder, Fred | 1164586400 | PA83071 | 0118354 |
| Fellows, Staci | 1346589553 | H405110 | 0111576 |
| Fox, Rajene | 1225401623 | H315440 | 0151430 |
| Garrett, Mary Lynne | 1811399637 | H400700 | 0111583 |
| Gibson, Clayton | 1215952510 | 7425461 | 2524665 |
| Gwinn, Betty | 1114076148 | NP76533 | 2270420 |
| Gwinn, Robert | 1831194158 | 0526264 | 0509935 |
| Habib, Ahmed | 1447230859 | H395540 | 0158835 |
| Hamilton, Jeffrey | 1972719318 | 7410951 | 2819409 |
| Harmon, Keith | 1730398165 | H350940 | 0136330 |
| Helming, Suzanne | 1538369756 | H102871 | 0069326 |
| Holt, Mark | 1962498089 | H157400 | 0929777 |
| Kanski, Rachel | 1205264371 | H367780 | 0111620 |
| Lim, Hoang | 1891012225 | H361920 | 0124859 |
| Lozowski, Brenda | 1346245388 | 0813402 | 313762 |
| Lozowski, David | 1588669543 | 7397231 | 0313520 |
| Moore, Jessica | 1073972279 | H447140 | 0161967 |
| Owens, Dana | 1568414852 | H438500 | 0144321 |
| Papadopol, Narcis | 1982823928 | 7410991 | 2953086 |
| Tongco, Cesareo | 1639311681 | H1226600 | 0069917 |

{6202013:}

| Provider | NPI | Medicare | Medicaid |
|---|---|---|---|
| Virostko, Douglas | 1538164868 | 7396381 | 0861447 |
| Zimmerman, Zane | 1750367249 | H015182 | 2405687 |

{6202013:}

## Schedule 1.7(d)(i)

### Leased Personal Property

Any of the following personal property leases with respect to the operation of the Hospital that have been designated by Purchaser as a lease to be assumed by Purchaser pursuant to Section 1.11:

| Party to Lease | Name of Lease | Term of Lease | Leased Property |
|---|---|---|---|
| Karl Storz Capital | Master Lease Agreement | 12/31/15 – 11/30/19 | Various pieces of medical equipment |
| MT Business Technologies, Inc. | Lease | 2/28/14 – 2/28/19 | Various copiers |
| Coshocton County Memorial Pain Management, LLC | Equipment Lease Agreement | 12/1/14 – 11/30/17 | Rental of medical equipment by the Pain Management Clinic from the Seller |
| GE Healthcare | Agreement | 12/16/15 – 12/16/20 | Various pieces of office and medical equipment |
| Immucor, Inc. | Echo Advantage Plus Agreement | 5/24/12 – 5/24/17 | Echo system |
| Watermark Medical, Inc. | Customer Rental Program Agreement | 1/19/15 – anytime with 30 days written notice by the Seller; anytime with four months written notice by Watermark | Two ARES home sleep test devices |

{6202013:}

## Schedule 1.7(d)(ii)

## Leased Real Property

| Lessee | Lessor | Property Leased | Type of Agreement | Start Date | Term Date |
|---|---|---|---|---|---|
| Coshocton County Memorial Hospital Association | CCMH Pain Management, LLC | 1523 Walnut Street, Suite 1 | Lease | 12/01/14 | 11/30/17 |
| Coshocton County Memorial Hospital Association | FPC Development, PLL | 440 Browns Lane, Coshocton, Ohio 43812 | Lease | 01/01/09 | 12/31/19 |
| Coshocton County Memorial Hospital Association | McCoy Plaza General Partnership | 101 Dave Longaberger Avenue | Lease | 06/01/16 | 05/31/17 |

{6202013:}

## Schedule 1.7(d)(iii)

## Tenant Leases

| Lessee | Lessor | Property Leased | Type of Agreement | Start Date | Term Date |
|---|---|---|---|---|---|
| Tammy S. Alverson, M.D. | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 205 | Lease | 06/01/11 | 05/31/16 |
| Tammy S. Alverson, M.D. | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 205 | Amendment | 06/01/16 | 05/31/17 |
| Genesis Medical Group LLC | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 202 | Timeshare | 06/09/14 | 06/09/17 |
| Primecare of Southeastern Ohio, Inc. | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 102 | Timeshare | 12/01/14 | 11/30/16 |
| SEOPG, Inc. | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 101 | Timeshare | 05/16/14 | 05/31/16 |
| SEOPG, Inc. | Coshocton County Memorial Hospital Association | 311 South 15th Street, Suite 101 | Amendment | 05/16/14 | 6/1/17 |
| MVHC | Coshocton County Memorial Hospital Association | 406 South 15th Street | Lease | 02/01/14 | 01/31/17 |
| Adie Tamboli, MD | Coshocton County Memorial Hospital Association | 1523 Walnut Street, Suite 2 | Timeshare | 01/01/12 | 12/31/17 |
| Central Ohio Neurological Surgeons | Coshocton County Memorial Hospital Association | 1523 Walnut Street, Suite 2 | Timeshare | 11/01/10 | 10/31/17 |
| Nephrology Consultants of SEO | Coshocton County Memorial Hospital Association | 1523 Walnut Street, Suite 2 | Timeshare | 03/01/11 | 02/28/17 |
| Ohio Specialty Foundation | Coshocton County Memorial Hospital Association | 1523 Walnut Street, Suite 2 | Timeshare | 04/16/16 | 04/15/17 |
| Tri-State Occupational Medicine | Coshocton County Memorial Hospital Association | 1523 Walnut Street, Suite 2 | Timeshare | 07/01/10 | 06/30/17 |
| Debbie E. Dickson Counseling, Inc. | Coshocton County Memorial Hospital Association | 221 Railroad Street, Warsaw | Timeshare | 01/01/11 | 12/31/16 |
| John M. Smilo, DPM | Coshocton County Memorial Hospital Association | 1410 Walnut Street | Lease | 07/01/11 | 05/31/16 |

{6202013:}

**Schedule 1.7(g)**

**Prepaids**

Each of the following as it relates to the Assumed Contracts and Assumed Leases:

<u>Vendors</u>

Purchased Services: $8,662

Dues & Subscriptions: $5,167

Purchased Maintenance:

| | |
|---|---|
| $3,350 | INFOR |
| $5,416 | Staywell Company |
| $2,093 | First Data Bank |
| $3,840 | Mainline Info Systems |
| $250 | McKesson |
| $9,574 | Mainline Info Systems |
| $5,452 | Kronos |
| $6,520 | Forward Advantage |
| $13,744 | Agfa |
| $1,275 | GE Healthcare |
| $4,752 | Merge Healthcare |
| $14,658 | 3M |

**Schedule 1.7(j)**

**Causes of Action**

To be provided by Prime no later than 30 days prior to the Sale Hearing.

{6202013:}

**Schedule 1.7(r)**

**Names and Symbols**

<u>Official business names</u>:
- Coshocton County Memorial Hospital Association
  - Entity No. 196020, corporation for non-profit
  - Original filing date with State of Ohio: 06/29/1946
  - Expiry date: 4/30/2017
- Coshocton County Memorial Hospital Pain Management, LLC
  - Entity No. 2393429, domestic limited liability company
  - Original filing date with State of Ohio: 5/11/2017

<u>Domain name</u>: www.ccmh.com

<u>Other hospital names used interchangeably in practice</u>:
- Coshocton County Memorial Hospital
- Coshocton Hospital
- CCMH

<u>Names of hospital clinics used in practice</u>:
- Coshocton Hospital Pleasant Valley Clinic
- Coshocton Hospital Dresden Clinic
- Coshocton Hospital Family Physicians Clinic
- Coshocton Hospital Arrowhead Clinic
- Coshocton Hospital Orthopaedic Clinic
- Coshocton Women's Health Center
- Coshocton Hospital Outpatient Oncology
- Coshocton Surgical Center
- Coshocton Heart & Vascular Center
- Coshocton Hospital Occupational Medicine Clinic
- Coshocton Pain Management Center (Joint Venture with Pain Management Group, LLC)
- Coshocton ENT Center

<u>Logos</u>: All three logos are currently used, but the Seller is phasing out the first logo. By September 2017, the Seller will only use the only the latter two logos. In the first logo, the cross in the middle of the capital H is blue. By agreement with Blue Cross/Blue Shield regarding intellectual property, the Hospital is ceasing use of this color scheme over time.



{6202013:}



{6202013:}

**Schedule 1.8(w)**

**Other Excluded Assets**

Any and all personal property owned by employees located at any of the Seller's facilities.

The medical staff maintains two restricted bank accounts for collecting dues for the medical society, funding education programs, and maintaining the medical staff library. One account is at PNC (Account Number xxxxxxxx1323) and the other account is at Century National Bank (Account Number xxxxxx5786).

Any restricted charitable donated funds that are not capable of being transferred to the Purchaser (pursuant to appropriate restrictions on use) under applicable law.

{6202013:}

## Schedule 1.9(m)

## Other Assumed Obligations

Any other obligations of the Purchaser under the DIP Loan that are not otherwise paid through the DIP Loan.

{6202013:}

## Schedule 2.2

## Binding Agreement

The Ohio Attorney General must approve the closing of the Asset Sale Agreement.

{6202013:}

## Schedule 2.4

## Required Consents

The Seller and the Ohio Nurses Association entered into a collective bargaining agreement between The Ohio Nurses Association/AFT, AFL-CIO (the "ONA") and the Seller on June 9, 2014 (the "Agreement"). The Agreement continues through June 8, 2017. The Side Letter to the Agreement requires the Seller to advise the ONA in writing 90 days in advance of a sale, assignment, transfer or any other change in name or ownership of the Seller, or as soon as possible if unable to provide 90 day notice. The Purchaser is not bound by the duration of the Agreement, but is free to begin negotiations with the Ohio Nurses Association, upon request, to enter into a new agreement if the Purchaser hires a majority of the nurses currently covered by the Agreement.

The Seller is party to two bond issuances, on which a balance of approximately $3,350,000 is due (the "Bond Debt"). JP Morgan Chase Bank, N.A. ("JP Morgan") provides a letter of credit to back the Bond Debt and is therefore the economic party in interest to the Bond Debt. All documents related to the Bond Debt and JP Morgan's guaranty thereof are referred to herein as the Bond Documents. The Bond Documents provide for liens and security interests in the Assets and would prohibit the transaction without the appropriate consents. However, Seller has informed JP Morgan about the transaction and intends to repay the Bond Debt in full with the proceeds of the DIP Loan Agreement. Accordingly, JP Morgan will consent to the transaction.

The Seller is party to three leases of property ("Tetra Agreements") with TFG-Ohio, L.P. ("Tetra"). The leases with Tetra state that Tetra owns certain Meditech equipment that is expected to be part of the Assets. Accordingly, Seller cannot convey undisputed title to that portion of the Assets without Tetra's consent. Seller has entered into a settlement agreement with Tetra under which it will pay Tetra a certain amount over time (current balance approximately $800,000) (the "Tetra Debt"). Seller intends to repay the Tetra Debt in full with proceeds of the DIP Loan Agreement. At that time, the relevant Assets will belong to Seller, and Tetra's consent will no longer be required.

The Seller owes The Home Loan Savings Bank $56,000 (the "Home Loan Savings Bank Debt"), which is secured by a first priority lien on the real property related to the Debtor's Pleasant Valley Clinic. Accordingly, Seller cannot convey undisputed title to that portion of the Assets without The Home Loan Savings Bank's consent. Seller intends to repay the Home Loan Savings Bank Debt in full with the proceeds of the DIP Loan Agreement. At that time, the relevant Assets will belong to Seller, and The Home Loan Savings Bank's consent will no longer be required.

**Schedule 2.5(a)**

**Compliance with Laws and Contracts**

The Department of Labor opened an investigation of the Coshocton County Memorial Hospital Non-Exempt Health Benefit Plan, which is still pending.

**Schedule 2.5(b)**

**Compliance with Laws and Contracts**

An old dual-feed fuel oil tank exists on the property at the Seller's 1460 Orange Street address. This fuel tank was recently inspected on February 10, 2016, and the tank passed inspection. Seller is in the process of obtaining an updated license for the tank.

{6202013:}

**Schedule 2.5(d)**

**Compliance with Laws and Contracts**

Seller is in payment default of numerous material contracts, which defaults could have an adverse effect on the Assets or the Business of the Hospital. They are incorporated herein by reference. Seller does not believe the payment defaults will have an adverse effect on the Assets or the Business of the Hospital in the context of the bankruptcy case and the assumption and assignment to Purchaser of the Assumed Contracts and Assumed Leases.

{6202013:}

**Schedule 2.6**

**Title to Assets**

The parties acknowledge that as of the Signing Date they have not received a Title Commitment for certain of the properties. Accordingly, Schedule 2.6 may be amended by mutual agreement following receipt of a complete Title Commitment.

{6202013:}

**Schedule 2.6(b)**

**Other Encumbrances to Property**

See lien search results attached hereto as **<u>Appendix 2.6(a)</u>**.[3]

---

[3] See supra fn. 1

{6202013:}

**Schedule 2.6(d)**

**Additional Property Used by Hospital**

None.

{6202013:}

**Schedule 2.7(a)**

**Valid Licenses and Certifications**

None.

{6202013:}

**Schedule 2.7(b)**

**Certain Representations with Respect to the Hospital**

The Seller's main hospital and clinics were last surveyed by the Joint Commission on August 3, 2015 – August 6, 2015. On August 7, 2015, the Joint Commission re-accredited the hospital and all of its clinic locations. This Joint Commission accreditation is valid for 36 months. The Joint Commission also recommended the Seller for continued Medicare certification. The Joint Commission certification deems the hospital and clinic locations eligible to participate in Medicare and Ohio Medicaid.

The Seller's hospital laboratory is also accredited through the Joint Commission's Laboratory Accreditation Program, effective 8/29/14. This accreditation is also valid for 24 months, and the Seller anticipates a resurvey of the laboratory in the summer of 2016.

{6202013;}

**Schedule 2.7(c)**

**Certain Representations with Respect to the Hospital**

None.

**Schedule 2.7(d)**

**Certain Representations with Respect to the Hospital**

None.

{6202013:}

**Schedule 2.7(e)**

**Loans or Guarantees Pursuant to the Hill-Burton Act**

None.

{6202013:}

**Schedule 2.8**

**Brokers and Finders**

SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (together, "SOLIC")

{6202013:}

## Schedule 2.9

## Financial Statements

None.

{6202013:}

**Schedule 2.10**

**Legal Proceedings**

- Ohio Nurses Association Mass Grievance regarding Seller's non-payment of Seller's portion of employee health care costs through Seller's self-insured health insurance program (filed January 7, 2015)

- Litigation related to the Tetra Agreements (Third Judicial District Court of Utah, Case No. 15-0906741). It is the intent of Seller to repay Tetra in full with proceeds of the DIP Loan Agreement, at which time this litigation will be dismissed.

**Schedule 2.11(a)**

**Employee Benefits**

(i) Pension and Retirement Programs

- Coshocton County Memorial Hospital Employees Pension Plan (Plan Number 001): This program is only available to registered nurses who are members of the Seller's Ohio Nurses Association union (the "Union Nurses"). This Plan was originally effective October 1, 1974. The Seller contributes 4% of each Union Nurse's salary to the pension plan each year.

- Coshocton County Memorial Hospital Tax Deferred Annuity Plan (Plan Number 004): This plan was originally effective January 1, 1992. The Seller provides a 403(b) Tax Deferred Annuity Plan to both non-union Employees and Union Nurses. The Seller provides a 3% of compensation match to any Union Nurse who defers 6% of his or her compensation. For non-union employees who defer at least 2% of their compensation, the Seller provides matching contributions equal to 50% of that employee's deferrals. These matches do not exceed 1% of the employee's salary.

- Coshocton County Memorial Hospital 457(b) Plan: This plan was originally effective June 1, 2009. This plan is only available to approved physicians and hospital executives.

(ii) Health Insurance Programs and Related Programs

- Employee Healthcare Plan: The Seller provides all full-time and full-time equivalent employees with comprehensive healthcare coverage. The Seller is self-insured for this program.

- Early Retiree Insurance: This program was a one-time program available to employees who were at least 55 and had 20 years of service with the Seller as of March 31, 2011. These employees retired with a severance payment, and retain employee health benefits (including medical, dental and vision) at the employee rate until they reach age 65.

- Union Nurses Health Retirement Plan: This program is only available to Union Nurses who retire early (between age 59.5 and age 65). The Union Nurses are eligible to receive a $200 reduction in the cost of the selected level of health insurance benefits until the Union Nurse turns 65. The Union Nurse must have been a participant in the health plan for the five years preceding retirement to be eligible for this program.

- Employee Dental Plan: The Seller provides all full-time and full-time equivalent employees with a dental insurance coverage option through MetLife. For non-union members, coverage is paid by the employee. For Union Nurses, the cost of coverage is split between the employer and the employee.

- Employee Vision Plan: The Seller provides all full-time and full-time equivalent employees the option to elect vision insurance coverage option through MetLife. Coverage is paid by the employee.

{6202013:}

- Flexible Spending Account: This program available to all employees. The Seller matches the employee's annual contribution to his or her flexible spending account up to $250.

- Health Reimbursement Arrangement: This program is only available to Union Nurses. The Seller provides $2,150 to each Union Nurse for reimbursement of medical co-insurance amounts each year. If the funds have not been exhausted at the end of each calendar year, $250 rolls over to the next plan year.

(iii) Life and Disability Insurance Programs

- Basic Life / AD&D: – Life Insurance Plan (Unum, Policy No. 555735 002): The Seller provides a $25,000 life and accidental death and disability insurance policy to all employees. The Seller also provides additional life insurance to Union Nurses. The amount of life insurance for which a Union Nurse is eligible is calculated each year by multiplying a Union Nurse's hourly rate by 2080.

- Optional Life/ AD&D Insurance Plan: (Unum, Policy No. 399810 001): The Seller provides non-union employees the option of purchasing additional life and accidental death and disability insurance. Union Nurses may also purchase additional coverage under this program.

- Long Term Disability: (Unum, Policy Nos. 555735 001 & 399809 001) The Seller provides all employees the option of purchasing long term disability insurance. The Seller provides long term disability insurance to Union Nurses at no cost to the Union Nurse.

- Extended Sick Time/Short Term Disability: The Seller provides all employees extended sick time/short term disability benefits when medically necessary and appropriate. Employees must submit an application for a leave of absence and complete applicable Family Medical Leave Act forms. Employees accrue extended sick time at a rate of .05769 based on straight time hours worked. Employees receive 60% of the employee's normal pay while on leave, and employees may use paid time off to supplement their extended sick time.

- Additional Workers' Compensation Payments: This program is only available to Union Nurses. If a Union Nurse has a valid workers' compensation claim, the Seller pays a Union Nurse the difference between the workers' compensation benefits and the Union Nurse's regular weekly earnings from the employee's accumulated sick leave on a prorated basis. A Union Nurse is eligible for this benefit from the date of injury.

(iv) Other Benefits

- Paid Time Off: Employees accrue paid time off at different rates based on years of service, position, union membership, date of hire, or shift worked. Employees may roll-over 90% of their maximum possible accrued hours from year to year. Employees may cash out their accrued PTO at the end of their employment with the Seller.

- Employee Assistance Services: (provided through Unum). This program includes childcare and/or eldercare referrals, personal relationship information, health information

and online tools, legal consultations with licensed attorneys, financial planning assistance, stress management, and career development resources for all employees.

- <u>Worldwide Emergency Travel Assistance:</u> (provided through Unum): This program includes hospital admission coordination, emergency medical evacuation, medically supervised transportation home, legal and interpreter referrals, prescription replacement assistance, multilingual crisis management professionals, medical referrals to Western-trained, English-speaking medical providers, and care and transport of unattended minor children for all employees.

- <u>Tuition Reimbursement:</u> The Seller provides tuition reimbursement for approved programs to both non-union employees and Union Nurses. Employees are eligible for the program after one year of employment. For non-union employees, the Seller provides for 50% reimbursement on approved tuition and course fees, not to exceed $2,750 per calendar year. For Union Nurses, the Seller provides up to $4,500 in tuition reimbursement for approved programs. Union Nurses agree to remain employed at the Seller for 6 months for each $1,000 received, or a Union Nurse must repay the amount of tuition reimbursement. All employees must receive grades of C or better to receive reimbursement.

- <u>Continuing Education and Training:</u> The Seller provides all employees with access to the Swank HealthCare online education platform for continuing educational programs. The Seller also provides all employees reimbursement for the cost of approved continuing educational programs and provides reimbursement for mileage to attend such educational programs. The Hospital provides Union Nurses three days with pay per year to attend educational programs.

- <u>Cell Phone Stipend:</u> The seller's management employees (approximately 25 employees) are paid a cell phone stipend of approximately $50 per month.

- The Seller also provides a physician referral bonus and free flu vaccinations for all employees.

{6202013:}

**Schedule 2.11(b)**

**Retirement Plan Liability**

None.

{6202013:}

**Schedule 2.12(a)**

**Personnel**

See list attached hereto as __Appendix 2.12(a)__.[4]

---
[4] See supra fn. 1.

{6202013:}

## Schedule 2.12(b)

## Personnel

The majority of the Seller's registered nurses, including all of the nurses who work at the Seller's main campus hospital at 1460 Orange Street, are unionized through the Ohio Nurses Association. The Seller and the Ohio Nurses Association entered into a collective bargaining agreement between The Ohio Nurses Association/AFT, AFL-CIO and the Seller on June 9, 2014. The Agreement continues through June 8, 2017.

The members of the Seller's ONA union filed a mass grievance on January 7, 2015, regarding the Seller's non-payment of Seller's portion of employee health care costs through the self-insured health insurance program. This grievance is currently pending in Step IV of the grievance process pursuant to the ONA Agreement.

An additional ONA grievance was filed at the Step IV level on behalf of Charli Guthrie, RN, who was terminated from her position in January 2016. This grievance was heard on April 19, 2016, and the response denying the request was forwarded on May 3, 2016. Ms. Guthrie has appealed this outcome to Step V (arbitration). The parties are in the process of selecting an arbitrator.

{6202013:}

# Schedule 2.12(c)

# Personnel

| Name | Position | Status | Date Terminated | Status at Termination | Full/Part Time |
|------|----------|--------|-----------------|----------------------|----------------|
| PRINDLE,VICTORIA M | RN | TERM | 23-Apr-16 | RESIGNED | FT |
| HUTSON,DEBRA J | REGISTRATION CLERK | TERM | 27-Apr-16 | RESIGNED | PT |
| POWERS,CAROLYN J | RN | TERM | 28-Apr-16 | RESIGNED | FT |
| MOODY,SHEENA M | MEDICAL ASSISTANT | TERM | 29-Apr-16 | QUIT WITHOUT NOTICE | FT |
| WILCOX,CASSAUNDRA E | HOUSEKEEPERS | TERM | 29-Apr-16 | QUIT WITHOUT NOTICE | FT |
| MILLIGAN,LEONA M | RN | TERM | 30-Apr-16 | RESIGNED | FT |
| EICK,BRIANE R | REGISTERED NURSE - NON-UNION HBC | TERM | 02-May-16 | RESIGNED | FT |
| PATTERSON,KRISTINA M | RN | TERM | 02-May-16 | RESIGNED | PRN |
| FREY,DAWN M | RECEPTIONIST | TERM | 06-May-16 | RESIGNED | FT |
| MORAN,JERI L | ADMINISTRATIVE ASSISTANT | TERM | 10-May-16 | CALL IN POSITION NO LONGER NEEDED | PRN |
| WAGNER,BRANDI L | RN | TERM | 12-May-16 | RESIGNED | FT |
| RODRIGUEZ,TOM | FINANCIAL ANALYST/REPORTING FINANCIAL | TERM | 13-May-16 | RESIGNED | EXE |
| GUNTER,JENNIFER LYDA | PHYSICIAN PATIENT ACCOUNTS MANGER | TERM | 20-May-16 | RESIGNED | EXE |
| HOSTETLER,RAE M | RADIOLOGY TECH | TERM | 23-May-16 | CALL IN POSITION NO LONGER NEEDED | PRN |
| BROWN,MIRANDA L | LPN | TERM | 23-May-16 | RESIGNED | FT |
| HARPER,MICHAEL B | LPN | TERM | 26-May-16 | RESIGNED | FT |
| WILLIS,JILL | CUSTOMER SERVICE | TERM | 31-May-16 | RETIRED FROM POSITION | FT |
| SILVESTRI,SCOTT G | CHIEF FINANCIAL OFFICER | TERM | 02-Jun-16 | RESIGNED | EXE |
| MATTHEWS,CAROLYN S | HEALTH INFORMATION SPECIALIST | TERM | 06-Jun-16 | QUIT WITHOUT NOTICE | FT |
| LEASURE,LEQUITA J | DIETARY AIDE | TERM | 08-Jun-16 | QUIT WITHOUT NOTICE | FT |
| COGNION,SHELLEY R | HOUSEKEEPERS | TERM | 08-Jun-16 | QUIT WITHOUT NOTICE | FT |
| DAVIS,DANNIELLE R | PHYSICIAN BILLER | TERM | 20-Jun-16 | RESIGNED | FT |

{6202013:}

**Personnel**

## Leadership Team Agreements

| Executive/Position | Agreement Type | Date of Agreement |
|---|---|---|
| Lorri Wildi, CEO | Contract | January 1, 2016 |
| Stephanie Conn, CNO | Letter of Employment | January 29, 2016 |

## Employed Physician Agreements

| Physician | Agreement Type (between CCMH and Physician unless otherwise noted) | Date of Agreement |
|---|---|---|
| Dr. Elaine A. Beed | Employment Agreement | October 26, 2015 |
| Dr. Alycia Findlay | Employment Agreement | October 23, 2015 |
| Dr. Clayton Gibson | Employment Agreement (between Genesis Medical Group LLC and Dr. Gibson)<br><br>Employee Lease Agreement (between CCMH and Dr. Gibson) | December 23, 2013<br><br>January 27, 2015 |
| Dr. Ahmed Habib | Employment Agreement | February 5, 2016 |
| Dr. Jeffrey Hamilton | Employment Agreement | July 14, 2014 |
| Dr. Keith Harmon | Employment Agreement | June 15, 2015 |
| Dr. Suzanne C. Helming | Employee Lease Agreement (Knox Community Hospital employs Dr. Helming) | July 2, 2014 |
| Dr. Mark Holt | Employment Agreement | January 14, 2013 |
| Dr. Aparna Jha | Employment Agreement | October 23, 2012 (leased to MVHC per agreement dated February 21, 2014) |
| Dr. Hoang Lim | Employment Agreement | May 12, 2015 |
| Dr. Brenda Lozowski | Employment Agreement | March 25, 2014 |
| Dr. David J. Lozowski | Employment Agreement | March 25, 2014 |
| Dr. Dana Nicole Owens | Employment Agreement | August 21, 2015 |
| Dr. Narcis A. Papadopol | Employment Agreement | June 18, 2013 (contract renewed March 24, 2016) |
| Dr. Cesareo Amadeo Urbano Tongco II | Employment Agreement | January 13, 2012 (resignation effective July 31, 2016) |
| Dr. Douglas J. Virostko | Employment Agreement | March 25, 2014 |
| Dr. Zane Wesley Zimmerman | Employment Agreement | May 8, 2015 |

{6202013:}

## Schedule 2.13

## Insurance

| Insurance Company | Type of Policy | Policy # |
|---|---|---|
| MHA Insurance Company | GL / PL, & Umbrella | 3OH000012339 |
| The Cincinnati Insurance Company | Self Insured Unemployment Compensation Bond | 8842917 |
| The Cincinnati Insurance Company | Business AUTO | EBA 001 35 65 |
| National Union Fire Insurance Company of Pittsburgh, PA | Helipad Insurance | AP 001851717-13 |
| Commerce and Industry Insurance Company | Airport Insurance | AV 001851718-13 |
| The Cincinnati Insurance Company | Directors and Officer | BCH-0005425 |
| The Cincinnati Insurance Company | Surety - Pension Bond | B80509536 |
| Chubb & Son | Customarq Property / Breakdown Policy | 3589-61-63 CIN |
| Medical Protectice | Mahany Tail | 732579 |
| Wat Consulting Company(Midwest) | Workers Comp Excess Premium | EW008356 |
| Westfield | Flood Insurance | 2411204975 |

{6202013:}

**Schedule 3.4**

**No Violation**

None.

{6202013:}

**Schedule 3.7**

**Legal proceedings**

*In re Coshocton County Memorial Hospital Association,* United States Bankruptcy Court for the Northern District of Ohio, Ohio, Case No. _____.

While it is Purchaser's positon that without regard to the results of the investigation it will not impact Purchaser's ability to consummate the contemplated transactions in the interests of full disclosure and to avoid any future issues, the Department of Justice has opened an investigation into allegations of wide spread medical overbilling in California by Purchaser. Purchaser views the claims as being without merit and is vigorously defending against the allegations.

{6202013:}

## Schedule 4.3(a)

## Negative Covenants

None.

{6202013:}

## Schedule 4.8

## Title Matters

The parties acknowledge that as of the Signing Date they have not received a Title Commitment for certain of the properties. Accordingly, Schedule 4.8 may be amended by mutual agreement following receipt of a complete Title Commitment.

{6202013:}

**Schedule 5.11**

**Maintenance of Services**

Medical Imaging

Rehabilitation Services

Women's Health

Audiology Services

Family Medicine

Sleep Medicine

Pain Management

Occupational Medicine

Acute Inpatient & Observation

Hospitalists I/P Care

Intensive Care

Emergency Medicine

Surgical Services
- General
- Orthopedics
- Ophthalmology
- Gynecology
- Urogynecology
- Podiatry
- Pain Injections
- Endoscopy

ENT

Medical Oncology & Infusions

Respiratory Care

Cardiology

Clinical Laboratory

Pharmacy

{6202013:}

**Schedule 6.3**

**DIP Financing**


Senior Secured Debtor-in-Possession Loan Agreement, dated June 30, 2016, between Coshocton County Memorial Hospital Association and Prime Healthcare Foundation, Inc.

16-51552-amk    Doc 207    FILED 10/03/16    ENTERED 10/03/16 16:33:22    Page 125 of 133

**Schedule 8.1**

**Governmental Authorizations**

- Approval by the Ohio Attorney General
- All material Medicaid, Medicare, pharmacy and laboratory authorizations licenses and permits as required for hospital operations, as presently conducted.

**Schedule 8.6**

**Title Insurance Policy**

The parties acknowledge that as of the Signing Date they have not received a Title Commitment for certain of the properties.  Accordingly, Schedule 8.6 may be amended by mutual agreement following receipt of a complete Title Commitment.

## AMENDMENT NO. 1 TO ASSET SALE AGREEMENT

THIS AMENDMENT NO. 1 TO ASSET SALE AGREEMENT (this "Amendment"), is made as of September 23, 2016, by and among Coshocton County Memorial Hospital Association, an Ohio non-profit corporation ("Seller"), on the one hand, and Prime Healthcare Foundation, Inc., a Delaware non-stock corporation organized exclusively for charitable purposes under §501(c)(3) of the Code ("PHS"), and Prime Healthcare Foundation-Coshocton, LLC, a Delaware limited liability company ("Prime-Coshocton" and together with PHS and their respective permitted assignee(s), "Purchaser"), on the other hand.

### RECITALS

WHEREAS, Seller and Purchaser are parties to that certain Asset Sale Agreement (the "Sale Agreement") dated as of June 30, 2016; and

WHEREAS, terms used but not otherwise defined herein shall have the meanings set forth in the Sale Agreement; and

WHEREAS, due to a clerical error, various Section headings and Article headings in the Sale Agreement are inaccurate, and Seller and Purchaser desire to amend the Sale Agreement to correct such clerical errors, as set forth herein; and

WHEREAS, pursuant to Section 1.11 of Sale Agreement, ten (10) days prior to the Sale Hearing (the "Closing Designation Date"), Purchaser is required to designate by delivery of a written election (each, an "Assignment Election") to Seller (such notice to be signed and dated by Purchaser) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time; and

WHEREAS, Seller and Purchaser desire to extend the time period Purchaser may designate contracts under Section 1.11 of the Sale Agreement, as set forth herein; and

WHEREAS, pursuant to Section 12.4 of the Sale Agreement, the Sale Agreement may only be amended by an agreement in writing signed by Seller and Purchaser.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Amendment to Sale Agreement. The following Section and Article headings are hereby amended as follows:

        (a)     The heading "Section 1.2 Certain Representations and Warranties" is amended to "Section 2.7 Certain Representations and Warranties."

        (b)     The heading "Section 1.3 Brokers and Finders" is amended to "Section 2.8 Brokers and Finders."

{6342636:7}

1

(c)     The heading "Section 1.4 Financial Statements" is amended to "Section 2.9 Financial Statements."

(d)     The heading "Section 1.5 Legal Proceedings" is amended to "Section 2.10 Legal Proceedings."

(e)     The heading "Section 1.6 Employee Benefits" is amended to "Section 2.11 Employee Benefits."

(f)     The heading "Section 1.7 Personnel" is amended to "Section 2.12 Personnel."

(g)     The heading "Section 1.8 Insurance" is amended to "Section 2.13 Insurance."

(h)     The heading "Section 1.9 Seller Knowledge" is amended to "Section 2.14 Seller Knowledge."

(i)     The heading "ARTICLE 2 REPRESENTATIONS OF PURCHASER" is amended to "ARTICLE 3 REPRESENTATIONS OF PURCHASER."

(j)     The subsequent Article and Section headings in the remainder of the Sale Agreement are renumbered accordingly.

2.     <u>Amendment to Section 1.11</u>.   Section 1.11 of the Sale Agreement is hereby amended and restated in its entirety as follows:

"1.11   Designation of Assumed Contracts and Assumed Leases.

(a)     No later than ten (10) days prior to the Sale Hearing (the "Closing Designation Date"), Purchaser may designate by delivery of a written election (each, an "Initial Assignment Election") to Seller (such notice to be signed and dated by Purchaser) each of the contracts and leases to which Seller is a party that Purchaser elects to have assigned to it as an Assumed Contract or an Assumed Lease as of the Effective Time. If Purchaser desires to supplement its Initial Assignment Election by choosing additional contracts it desires to have assigned to it as an Assumed Contract, Purchaser must supplement its Initial Assignment Election by delivering a supplemental assignment election to the Seller no later than October 7, 2016 (the "Supplemental Assignment Election"). Seller will file a notice reflecting the contracts described in the Supplemental Assignment Election, as applicable, by October 10, 2016. Subject to Section 4.4.2, Purchaser and Seller shall cause each of the contracts and leases for which Purchaser delivers an Initial or Supplemental Assignment Election prior to the Closing Designation Date to be assumed and assigned to Purchaser at Closing. The Assumed Contracts and Assumed Leases listed on the Initial Assignment Election and Supplemental Assignment Election shall be subject to a further Sale Hearing to occur on or before October 21, 2016. "Sale Hearing" means the hearing only with respect to the assumption and assignment of those listed on the

Initial and/or Supplemental Assignment Election of the Bankruptcy Court to approve the transactions contemplated by this Agreement.

(b)     No later than ten (10) days prior to the Sale Hearing, Purchaser shall designate in a written notice signed and dated by Purchaser (the "Evaluation Notice") to Seller any contracts and leases not already identified pursuant to Subsection 1.11(a) above that Purchaser, in its sole and absolute discretion, desires to evaluate for potential assumption by Seller and assignment to Purchaser (collectively, the "Evaluated Contracts"). Purchaser may not list more than five (5) contracts or leases as Evaluated Contracts.

(c)     No later than thirty (30) days after the Closing Date (the time from the Closing Date to such date, the "Evaluation Period"), (i) Purchaser shall notify Seller in writing (each, an "Assignment Notice") of which Evaluated Contracts are to be assumed by Seller and assigned to Purchaser (collectively, the "Subsequently Assigned Contracts" or "Subsequently Assigned Leases" as the case may be) and (ii) Purchaser shall notify Seller in writing signed and dated by Purchaser (each a "Rejection Notice") of which Evaluated Contracts are to be rejected by Seller (collectively, the "Rejected Contracts"). Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that Final Orders (x) assuming and assigning the Subsequently Assigned Contracts or Subsequently Assigned Leases to Purchaser are entered and (y) rejecting the Rejected Contracts are entered. Regardless of whether an Evaluated Contract becomes a Subsequently Assigned Contract, Purchaser shall pay in advance all obligations of Seller under the Evaluated Contracts during the Evaluation Period and any time thereafter required for Bankruptcy Court approval of rejection or assumption and assignment of the Evaluated Contract. It is the intent of the parties that Seller shall have no monetary exposure for any Evaluated Contract after the Closing Date. Notwithstanding anything to the contrary set forth in this Agreement, the Subsequently Assigned Contracts or Subsequently Assigned Leases, as the case may be, shall constitute Assigned Contracts or Assigned Leases pursuant to, and as defined in, this Agreement, and Purchaser shall pay all Cure Costs with respect thereto. With respect to each Subsequently Assigned Lease, Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease. Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement."

3.     All other sections, paragraphs, provisions, clauses and exhibits in the Sale Agreement not expressly modified above remain in full force and effect as originally written.

4.     The provisions set forth in this Amendment shall be deemed to be and shall be construed as part of the Sale Agreement to the same extent as if fully set forth verbatim therein. In the event of any variation or inconsistency between any provision contained in this Amendment and any provision contained in the Sale Agreement, the provision contained herein shall govern. All references in the Sale Agreement or any other agreements, instruments and

documents executed and delivered in connection therewith to the "Agreement" (including, without limitation, the terms "hereof," "hereunder," "herein," "hereby" and similar terms) shall be deemed to refer to the Sale Agreement as amended hereby, except in the case where any such reference relates to the original date of the execution of the Sale Agreement, in which case such reference shall relate to the Sale Agreement before giving effect to this Amendment.

5.     This Amendment shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Ohio (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Amendment, and consent to the exclusive jurisdiction of, the Bankruptcy Court. The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Amendment on the basis of lack of jurisdiction over the Person or forum non conveniens.

6.     This Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Amendment in any proceeding brought hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, this Amendment has been entered into as of the day and year first above written.

PURCHASER:

**Prime Healthcare Foundation, Inc., a Delaware corporation**

By: _____

Name: *MIKE HEATHER*

Title: *CFO*

**Prime Healthcare Foundation- Coshocton, LLC, a Delaware limited liability company**

By: _____

Name: *MIKE HEATHER*

Title: *CFO*

SELLER:

**Coshocton County Memorial Hospital Association**

By: _____

Name: _____

Its: _____

IN WITNESS WHEREOF, this Amendment has been entered into as of the day and year first above written.

PURCHASER:

**Prime Healthcare Foundation, Inc., a Delaware corporation**

By:_____
Name: _____
Title: _____

**Prime Healthcare Foundation- Coshocton, LLC, a Delaware limited liability company**

By:_____
Name: _____
Title: _____

**SELLER:**

**Coshocton County Memorial Hospital Association**

By: _Lorri S. Wildi_____
Name: _LORRI S. WILDI_____
Its: _CEO_____